NEW ROADS OILMILL & MFG. CO., Limited, v. KLINE, WILSON & CO.

(Circuit Court of Appeals, Fifth Circuit. June 3, 1907.)

No. 1,583.

1. CUSTOMS AND USAGES—CONTRACTS—CONSTRUCTION—QUESTIONS FOR JURY.
    Whether a trade custom or usage is established by the evidence in a case, and, if so, whether it was known to a party contracting, or was so general and well established that he must be presumed to have known of and contracted with reference to it, are questions for the jury.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs and Usages, § 47.]

2. SAME.
    It is competent for the parties to a contract to exclude a usage therefrom, and in order that a usage may be read into a written contract it must be consistent with the terms of the writing.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs and Usages, §§ 29, 34.]

3. SAME—KNOWLEDGE OF USAGE.
    The usage of a trade being always eligible to supersede the ordinary or public meaning of words as used in a contract, it is merely a question for the particular case whether the parties have in fact spoken according to that standard, and, if one of the parties was not a member of the trade or circle in which the usage obtained, his actual knowledge of it as applicable to the transaction must be shown before it can be inferred that he contracted with reference thereto.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Customs and Usages, §§ 23, 24.]

4. SAME.
    Defendant, which had recently built a mill for the crushing of cotton seed at New Roads, La., authorized a broker in New Orleans by telegraph to sell for it a quantity of oil cake for future deliveries "F. O. B. New Roads," at certain prices which had been quoted by the broker as prevailing in the market. The broker negotiated a sale to plaintiff, and wired defendant for its acceptance, which was also sent by wire. On receipt of the sale contract, defendant refused to execute the same, because

it provided for delivery of the cake at a shipping port. In an action to recover damages for breach of the contract, plaintiff claimed that the delivery provided for in the contract was in accordance with the usage of the market and the rules of the International Cottonseed Crushers' Association, of which, however, defendant was not a member. *Held*, that the question whether a contract of sale binding on defendant was made by the correspondence and acts of the broker, in view of the evidence as to usage, was one for the jury.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

M. T. Hewes, for plaintiff in error.

John Clegg and Lamar C. Quintero, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. The assignment of errors in this case submits: (1) The lower court erred in permitting the plaintiffs to amend their petition after issue had been joined; (2) in overruling the peremptory exception to the jurisdiction of the court; (3) in refusing to instruct the jury, as requested by the defendant, etc.; (4) in instructing the jury, at the request of plaintiffs' counsel, to return a verdict for the plaintiffs; (6) in rendering judgment against defendant upon the facts presented.

We conclude from our study of the record in this case that only the fourth and sixth of these specifications of error merit our attention. These require consideration of the pleadings and of all of the proof, and justify a statement of the features of the evidence in some detail.

Conforming to the practice in Louisiana, the action was begun by petition. It alleges that on the 26th of August, 1902, the petitioners purchased of the defendant company 1,500 tons, of 2,240 pounds each, prime cotton-seed cake for the shipments and prices specified; also that the defendant executed a written contract made an exhibit to the petition (set out in our recitals of the proof); that after having made the contract with the defendant they sold the November shipment to be delivered to Barron & Bodenheimer at a safe port in Danish Denmark, and the first half and last half of December shipment was sold for delivery to Otto Monstrom, Alborg, Den.; that defendant failed to make deliveries; that they, at the period of each default, purchased like goods in the open market at a cost to them of $2,700 more than they had contracted to pay to the defendant for the goods bought of it. The defendant denied, generally and severally, all and singular the allegations of the petition.

The defendant, a corporation—which we will refer to as "the company"—was organized under the laws of Louisiana, in 1902, and was erecting its plant at New Roads, situated on the Texas & Pacific railroad, about 120 miles from New Orleans. The plaintiffs below— whom we will refer to as "the petitioners"—were engaged in general business in New Orleans, and P. J. Strouse was manager, with full authority over and sole control of the cotton-seed product department of their business, buying such goods for them and selling it to parties in Europe. R. C. Burke was a broker engaged in the cotton-

seed product business, with his office in New Orleans. In August, 1902, the mill of the company was not ready to begin operation. The company was buying seed and building its mill. Burke commenced soliciting its business as early as July 15th, and continued sending his soliciting letters and literature up to August 21, 1902, when he received a letter from the company advising him that it felt disposed to sell some cake and oil for the last half of November and December shipment; that it desired to know the best he could do on same, and also to whom sales would be made, and whether the parties were responsible or not, as the officers of the company were strangers in that territory. To which Burke replied, August 22, 1902:

"I beg to acknowledge your favor of the 21st and note that you feel disposed to sell some cake and oil for the last half of November and December shipment, also that you desire to know best I can do on same, and also to whom sales are to be made; whether the parties are responsible or not, as you are strangers in this territory. Answering the latter, I beg to advise that you can thoroughly rely on the responsibility of any buyer to whom I sell your stuff. I do business with every responsible and reliable buyer in this market, and consequently cannot name any particular one to whom I might sell your product, as this depends entirely on the market the day I make sales; some time one buyer, then again another is in at the better price, and I work to secure the fullest price for my mill; but if you desire the name of the buyer in each case I will furnish same to you as soon as trade is closed. Your statement that you desire to sell some cake and oil for last half November and December shipment is a little vague, as I do not know just how much you care to offer, and how much will be shipped each month. For instance, on today's market for November I can quote about $24.50, subject unfilled, and for December $24.00, and this might be bettered slightly if the December stuff were first half shipment. The same applies in the case of the oil; I don't know how much you want to sell nor how much each shipment. As I am desirous of starting business for your account with a good sale, I would suggest that on receipt of the present you wire me promptly advising how much cake you want to offer last half November, and how much first half of December. The same in the case of the oil and then I will be in a position to bid you firm on same, and besides get you a better price than if I just offered your stuff last half November, first half December. Kindly intimate also what price you expect to get, as I find by approaching the buyer with a firm offer that much better results can be obtained, because, even while he may not accept at the price named, he will come back with a counter, which is generally a bit higher than if you asked him for a bid in the first place. Now, gentlemen, I am very anxious to handle your business, and want to get satisfactory results, so ask that you let me hear from you promptly by wire, and I feel sure we can pull off a trade."

In reply to this letter, the company wired Burke (August 25th):

"We offer prices mentioned your letter twenty-second or better, F. O. B. New Roads, fifteen hundred tons cake, as follows: five hundred last half November, five hundred first half December, five hundred last half December; also fifteen tanks oil, sixty-five hundred gallons each, as follows: five tanks last half November, five tanks first half December, five tanks last half December."

On the morning of the 26th Burke wired the company:

"Telegram received. Accept five hundred prime cake November twenty-four seventy-five; five hundred first half December, twenty-four quarter; five hundred last half December, twenty-four, all per long ton, shipside Westwego. Confirm. Will work oil to-morrow."

In the afternoon Burke wired again:

"Can't work oil. Market dead. Answer my wire regarding cake."

He also wrote the company:

"I beg to acknowledge receipt of your telegram of yesterday evening. Same was not received by me until about seven or seven thirty in the evening, at my residence. I left my office about five thirty or five forty-five and it had not been delivered then. Your wire was as follows: [Here reciting the wire from the company given above.] Upon receipt of same I went down town and looked up some of my buyers and succeeded in getting bids on same somewhat better than indicated in my letter of the 22d. My wire read as follows: [Here he recites his wire.] All of which I now confirm and await your confirmation in the premises. I note in your telegram that you state 'we offer prices mentioned your letter twenty-second, or better, F. O. B. New Roads, &c., &c.,' which I do not quite understand, in so far as the term 'F. O. B. New Roads' is concerned, as our quotations are based on shipside prices per long ton, unless otherwise stipulated. I suppose you meant the shipments were to be for the time specified F. O. B. New Roads, and not for delivery. In any event I await your telegram in the premises, and will wire you later on oil."

In this letter he enclosed what we may term a "broker's sale note," as follows:

"New Orleans, August 26, 1902. New Roads Oil Mill & Manufacturing Company, Ltd., New Roads, La.—Gentlemen: I have this day sold for your account to Kline, Wilson & Co., of New Orleans, La., fifteen hundred (1500) tons of 2,240 lbs. each, prime cottonseed cake, for the shipments and prices named below: five hundred tons November shipment, at twenty-four seventy-five ($24.75) per long ton, delivered shipside Westwego, La.; five hundred tons first half December shipment at twenty-four twenty-five ($24.25) per long ton, delivered shipside Westwego; five hundred tons lasts half December shipment, at twenty-four dollars ($24.00) per long ton, delivered shipside Westwego, La. Weight and quality guaranteed by seller. Terms: S-D bill-lading attached. Brokerage of 12 1-2 cents per long ton to be paid me by you in consideration of the above contract, subject to the rules and regulations of the Interstate Cottonseed Crushers' Association."

Before this advice by mail was or could have been received by the company, it wired Burke, August 26, 1902:

"Telegram received notifying us sale of cake, which we confirm."

On the next day (27th) Burke wrote the company:

"I beg to confirm my wire of yesterday afternoon in reference fifteen tanks of oil [reciting his second wire]. * * * I beg to acknowledge your wire of yesterday afternoon confirming sale of fifteen hundred tons of cake. * * * The buyer is Kline, Wilson & Co. of this city, one of the most responsible buyers of this market. I inclose contract in duplicate, covering the sale, one copy of which please sign and return to my buyers' files."

The contract sent in duplicate is the Exhibit A annexed to the petition, and substantially followed the broker's sale note set out above, with this addition at the foot:

"Accepted. P. pro Kline, Wilson & Co. P. J. Strouse."

This contract in duplicate was promptly returned by the company, with the following letter in reference thereto.

"We are in receipt of your letter of the 27th ult., inclosing duplicate contract to sell Kline, Wilson & Co. fifteen hundred tons of cake. We sold this cake F. O. B. New Roads, as you will see by reference to our telegram, but we note that the contract reads delivered shipside Westwego, La. Please change same to conform with the terms of our sale and return same to us and we will take pleasure in executing same. Asking your prompt attention to this matter, we remain—."

To which Burke responded:

"I beg to acknowledge your favor of the 30th, and note you return contract asking that same be changed to conform to the terms of your sale, which was F. O. B. New Roads. Now, gentlemen, I am in doubt as to what you mean by the above. [He then recites the course of their dealings at length, and concludes:] Now, gentlemen, I have gone into the matter thus fully to show you that the contract as forwarded to you is correct in every particular, and I return to you for your acceptance. I trust that the matter is as I suppose it is, and as mentioned above, but in any event you can readily see that my buyer considers the matter closed, and of course holds to the conditions of sale. I have no doubt that you will see the matter in its proper light and will return the contract properly signed. I regret that when your Mr. Fitzhugh was in here the other day this matter did not arise, but I showed him copy of contract, but whether he noted same or not I do not know; in fact, I do not believe he did. Kindly sign one copy and return for my buyers' files."

To this the manager of the company replied:

"We will adhere to our original position and refuse to confirm the sale, because not made in accordance with our telegram. You were acting as our agent in this matter and had no right or authority whatever to change or alter our proposition in any particular. You had been in correspondence with us and had quoted us certain prices on our cake. You did not say that to get this price it was necessary for us to deliver our cake to Westwego, New Orleans or Hamburg, nor did you say whether the cake was loose or sacked. I authorized you to sell fifteen hundred tons F. O. B. New Roads, at a certain price, intending to deliver loose cake. Instead of making me a counter offer at about two dollars less than the price I authorized you to sell, you made the sale at that price and wired back as follows: 'Telegram received. Accept five hundred, etc., etc.' I did not understand the meaning of the last part of your telegram, as I had never heard of Westwego, but supposed it related to some detail of shipping which would be explained in your letter. I had no idea it was intended to reduce our price nearly two dollars per ton. The beginning of your telegram showed that you had received my telegram of instructions. Immediately following you use the word 'accept.' Then follows a statement of the amount of cake offered by us. This led me to believe that you had acted in accordance with our instructions. You had no right to accept on any other terms than those mentioned by us. Now, regarding your statement that the price mentioned by me was ridiculous, beg to remind you of the fact that we have a right to put any price on our cake that suits us. You have an equal right to buy or let it alone. In conclusion, we would remind you of the fact that before a trade can be closed a mutual understanding must exist. From your letter it is very evident that such has not been the case with us, and consequently there can be no trade. Referring to your letter of the 25th ult. [26th, inclosing sale note?], would say, that I never received that letter until my return from New Orleans. I regret very much that you did not explain this transaction while I was there. I also regret that in my first attempt to do business with you, so serious a misunderstanding has arisen. We herewith return your contracts, which we refuse to accept and decline to confirm your sale."

On the contracts thus the second time returned, the company indorsed in the margin:

"We will accept this sale if made to read F. O. B. New Roads, La., at the prices mentioned herein, cake to be delivered loose."

On September 9th Burke wrote, and appears to have placed in the hands of petitioners (i. e., Strouse) for delivery, the following letter:

"New Roads Oil Mill & Manufacturing Co., Limited, New Roads, La.—Gentlemen: I beg to acknowledge your favor of the 6th inst., and in this connection beg to advise that I have turned over to my buyers, Messrs. Kline,

Wilson & Co. of this city, all the telegrams and correspondence relating to the sale of 1500 tons cake to them. My buyer will take up this matter direct with you, and I trust you will come to an amicable understanding."

Of even date therewith the petitioners (Strouse) took up the correspondence with the company, and, after reviewing the different steps of the negotiation, say:

"When we made this transaction we acted in good faith, and presumed you were acting likewise. In a spirit of fairness to all concerned, we will offer you to leave this matter to arbitration (specifying mode), or if you prefer we will leave the matter to the arbitration committee of the Interstate Cottonseed Crushers' Association, of which you are perhaps members."

To this the company replied:

"We note you have from Mr. Burke all the correspondence and telegrams relating to the transaction referred to by you. It will therefore be unnecessary for us to review the details of this transaction, as you already have them. You already know the position we take in this matter. We regret very much that Mr. Burke misunderstood us and that we misunderstood him, but it is one of those unfortunate occurrences which sometimes happens to strangers. * * * We are glad to know that you have not been injured, as cake is worth less now than at the time we made our offer and will probably be worth still less in November and December. We have never yet heard from Mr. Burke nor do you state whether you thought you were buying loose or sacked cake. It was our intention to furnish loose cake."

It is unnecessary for us to make further reference to the written evidence. We will notice briefly some of the features of the oral testimony. Burke said that he "kept them (the petitioners; i. e., Strouse) informed of the transactions as they came up." Asked at what price he had bought cotton-seed cake between the 1st and 9th of September for November and December delivery, he said he did not buy any for November and December delivery. Asked were there not any published quotations at that time, he said: "I do not think there were any published quotations, excepting quotations for current periods." Strouse testified:

"In the latter part of August some time, one evening after dinner, Mr. Burke rung me up and asked me if I was in the market for some cotton-seed cake, and I told him I was, and gave him the prices that I was willing to pay, and he then told me he had a telegram from the New Roads Oil Mill Company, and gave me the prices, which were five hundred tons last half November shipment, $24.75; five hundred tons first half December shipment at $24.25; and five hundred tons last half December shipment at $24; and I told him that I could not very well pay those prices; that I could pay $24.50 for last half November shipment, and $24.25 and $24 for first half December and last half December shipment; and after talking over the matter for a while I decided to buy the cake, and gave him the offer at $24.75, $24.25 and $24, for the three shipments named, respectively, and he made out the telegram and read it to me through the phone that he was offering the New Roads Company, and they were named in the telegram."

Strouse identified the telegram first sent by Burke (as we have recited it) as the one read to him before its being sent, and said that Burke also showed him the company's telegram dated August 26th; that he considered the trade closed the moment he saw that telegram, and entered it upon his books accordingly, and "applied it against his sales on the other side." Being called by the defendant, he testified:

"I did not make any sales between August 26th and September 1st; none at all. We sell only to foreign markets. On August 22d we sold thirty-five hundred tons to Barron & Bodenheimer, to be shipped from New Orleans in October and November; and on August 21st sold to Otto Monstrom fifteen hundred tons for December shipment."

Being asked how many purchases of cotton-seed cake he made between August 26th and September 1st, he said, "None at all."

Touching the matter of damages, in order to show the prices at which cotton-seed cake could have been bought on and after September 1, 1902, for November and December delivery, the defendant offered the testimony of witnesses who had had dealings in cotton-seed meal, with only one transaction in cotton-seed cake during the period, which evidence tended to show that there was generally little or no difference between the value in the market of cotton-seed meal and cotton-seed cake; that cotton-seed meal was produced by the mill first making the cake and then crushing the cake; but the court, on objection by petitioners' counsel, excluded such evidence and held that only evidence of the price of cake could be heard. There is no evidence to show that any of the parties to this negotiation were members of the Interstate Cottonseed Crushers' Association at that time. It is shown that the manager of the company was not a member and knew nothing of the rules of the association. No effort was made or evidence offered to show explicitly what were the rules of that association.

The proof shows that the freight rates from New Roads to Westwego were about $1.90 per ton. The manager of the company testified:

"We sack very little cake. It is generally estimated that there is a difference of $1.25 to $1.50 per ton between the price of loose cake and cake in sacks."

Some customs are so well established and so universally recognized as to have become a part of the law of the land, and a party will not be heard to allege his ignorance of them. Others, however, are so restricted as to locality or trade or business that ignorance of them is a valid reason why a party will not be held to have contracted in reference to them. Not only the existence of such a custom, but whether the knowledge of it exists in any particular case, are questions of fact for the jury. It is for them to determine, under proper instructions from the court, whether the evidence as to the existence, duration, and other characteristics of the custom, and as to knowledge thereof by the party therein, shows a custom of such age and character that the law will presume that the parties knew of and contracted in reference to it, or whether the custom is so local and particular that knowledge in the party to be charged must be affirmatively shown and may be negatived. Mechem on Agency, § 486.

A broker is one whose occupation it is to bring parties together to bargain, or to bargain for them in matters of trade, commerce, or navigation. He is essentially a middleman or go-between. Brokers are of many kinds, according to the particular class of transactions in which they engage. Id. § 13.

Evidence to show that there is not an agreement at all is admissible in cases where explanation of the terms of the contract is required, and in the introduction of usages into the contract. The usage must be consistent with the terms of the contract, for it is optional with the parties to exclude the usage if they think fit, and to frame their contract so as to be repugnant to its operation. A party will not be bound by a custom of the market of which he was not aware, and which altered the intrinsic character of the contract. Where the other party to the contract looks through the agent to the principal, whose name is disclosed (in the manner and to the extent shown in this case), the agent practically drops out of the transaction. Anson on Contracts, pp. 342–345.

Where a statement is made in the course of a correspondence, the rest of the correspondence must be admitted so far as it is connected with, or necessary to, a full understanding of what follows. This principle applies to admit a prior writing referred to, and the reference may be implied only. 3 Wigmore, § 2120.

The ordinary standard or "plain meaning" of language used in correspondence or other contract writing is simply the meaning of the people who did not write the document, and to insist that the language used in the writing must be given this "plain meaning" involves the fallacy of assuming that there is, or ever can be, some one, real, or absolute meaning. In truth, there can only be some person's meaning, and that person's meaning the law is seeking is the writer of the document. 4 Wigmore, § 2462.

The usage of a trade, or locality, or sect, or dialect, being always eligible to supersede the ordinary or public sense of words, it remains merely a question for the particular case whether the parties have, in fact, spoken according to that standard. Where all the parties are members of the same trade or other circle of persons, little difficulty can arise. The only requirement is that the special sense alleged should be, in fact, a usage or settled habit of expression, and not merely the expression of a few persons or of casual occasions. And, when one of the parties is not a member of a trade or other circle, his acceptance of the standard must be made to appear. For this purpose his actual knowledge of the particular sense as applicable to the transaction would suffice; otherwise it must appear to be so generally known in the community that his actual, individual knowledge of it may be inferred. The application of the general principle would then be simply a question of the probabilities of the meaning for each case. 4 Wigmore, § 2464.

We refrain from discussing questions which arose on the trial touching the matter of damages, as they may not arise hereafter, or at least present the same features.

We must strive to clear our minds of the confusion of thought that leads to the misuse of catch words and phrases and to the misapplication of familiar rules of evidence and settled principles of law. The writing in this case is not of that solemn character which in itself constitutes a contract between parties. At most, these telegrams and letters are only evidence tending to prove an agreement. The crucial question they present is, Did the parties reach an agreement? Other

questions may follow. We are constrained to conclude that under the common-law system of jurisprudence the trial court could not, on the evidence admitted, rightly solve these questions without the aid of the jury.

It is our opinion that the fourth and sixth errors assigned are well taken, and that the judgment should be reversed and the cause remanded for a new trial. And it is so ordered.