**A. F. PYLANT, INC., Appellant,**

v.

**ESCAMBIA TREATING COMPANY, Appellee.**

**No. 18101.**

United States Court of Appeals
Fifth Circuit.

April 14, 1960.

Rehearing Denied May 13, 1960.

Jesse W. Shanks, Purvis, Miss., M. M. Roberts, Hattiesburg, Miss., R. A. Hepner, Pensacola, Fla., for appellant.

Joe J. Harrell, Pensacola, Fla., Jones and Harrell, Pensacola, Fla., for appellee.

Before RIVES, Chief Judge, and TUTTLE and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case turns on the construction of a contract. The point at issue is whether the parties agreed to a second inspection of seasoned cross-ties, subject to certain "rigid" specifications, the ties having already passed an earlier inspection in the green or unseasoned state. We agree with the trial judge's construction of the contract, and affirm the judgment below.

Appellant, A. F. Pylant, Inc., a Mississippi corporation, cuts and sells crude cross-tie timbers. Appellee, Escambia Treating Company, a Florida corporation, creosotes and sells treated railroad cross-ties. Escambia agreed to supply a large number of treated ties of unusual size and quality to the Mozambique Na-

tional Railroad of Mozambique, Portugese East Africa. To fill this order Escambia contracted with Pylant for 269,000 cross-ties at $1.71 a tie.

The original agreement, dated December 29, 1953, provided for inspection of the ties by an independent inspection company designated by Mozambique. The parties agreed, in the following language, that the inspectors' decisions would be binding:

> "Both parties hereto agree that all decisions made by such inspectors as to the quality of ties and the compliance thereof with specifications, shall be final and binding on both parties and all certificates issued by such inspectors relating to inspections shall be conclusive and shall bind both parties."

Mozambique, the ultimate user, designated A. W. Williams Inspection Company, a recognized independent inspection company, as the agency to make inspection of the ties.

The contract required Pylant to stack at least 150,000 ties in the field for air-drying and seasoning. These ties were to be given a first inspection by the inspection agency at the time they were stacked. The remaining 119,000 ties, at the option of Pylant, were to be delivered to Escambia either as dry or green ties. Pylant agreed to replace rejected ties without cost to Escambia.

The day after the contract was executed, Escambia wrote Pylant "confirming [their] verbal discussion and agreement of yesterday" modifying the original agreement in three respects. (1) Escambia authorized Pylant to use Escambia's yard for storage of ties, free of charge, during the air seasoning period. (2) At the option of Pylant, Escambia agreed to stack the ties for two and one half cents a tie. (3) The parties agreed that the ties would "remain the property of [Pylant] during the drying period, the same as if they were stacked in other yards", Escambia to lend Pylant $1.71 for each tie delivered to the yard. The letter concluded: "It is understood and agreed that nothing in this letter constitutes a waiver or change of the contract between the two parties. It is also understood and agreed that these ties remain your property, and that in the event any of these ties are rejected because of splits or stack rot, you will replace such ties without cost to us or repay the loan on such ties."

Pylant delivered the ties in the green state to Escambia's yard. Escambia stacked the ties. An inspector for A. W. Williams Company inspected the ties and stamped "AWW" on them. This signified that the ties met American Railway Engineering Association (AREA) specifications for green ties and passed the initial inspection. When Williams Company rejected ties, Pylant made replacements without objections.

By a supplemental agreement dated May 31, 1954, set forth in the footnotes to this opinion,[1] the parties amended the

1. "1. Notwithstanding the provisions of Section 3 of the Original Agreement, Escambia, subject to the conditions and limitations hereinafter set forth, agrees to accept delivery of, at its plant at Goulding, Florida, and the title to green cross-ties (now in storage at said yard or hereafter delivered) in lieu of air-seasoned cross-ties, provided such cross-ties otherwise conform to specifications and bear inspection stamp of approval, and to pay therefore as provided in Paragraph 5 of the Original Agreement; provided, however, all amounts heretofore advanced or loaned by Escambia to Pylant and accrued interest thereon shall be credited to Escambia and against the purchase price of cross-ties in storage at said yard, which have been heretofore owned by Pylant; provided, further, Pylant shall pay to Escambia on Friday of each week, $1,944 for each 1000 green cross-ties stored and received for storage during the seven days immediately before Thursday of the preceding week, and Pylant warrants that all of said green cross-ties shall conform to specifications of the American Railway Engineering Association, and shall be acceptable to designated inspection agency under these specifications upon completion of the air-seasoning period, and that in event any of the said cross-ties shall not be acceptable to the inspection agency under these specifications at any time before or at the end of the period of air-seasoning,

original agreement. The original contract clearly provided for two inspections, a first or field inspection of green ties and a final inspection for seasoned ties. The pertinent language of the original contract reads:

> "All air-seasoned ties delivered hereunder *in addition to the field inspection above described,* upon delivery to Escambia at its plant at Goulding, Florida, *shall be given a final inspection* for moisture content rot developing from stack burn and splits. All green ties, except in those instances where final inspection in the field prior to shipment is requested by Pylant in writing, shall be given final untreated inspection at Escambia's plant at Goulding, Florida."

The controversial language of the supplemental contract reads:

> "* * * and Pylant warrants that *all of said green cross-ties shall conform to specifications of the American Railway Engineering Association,* and shall be acceptable to designated inspection agency *under these specifications upon completion of the air-seasoning period,* and that in event any of said cross-ties shall not be acceptable to the inspection agency under these specifications at any time before or at the end of the period of air-seasoning, upon being notified by Escambia of such rejects, then Pylant shall replace such cross-ties with another green or dry cross-tie conforming to specifications and acceptable to the inspection agency, without cost to Escambia."

Some time after May 31, 1954, a dispute arose over the correctness of the rejection of certain ties. Pylant, however, continued to replace rejected ties until 20,989 ties were replaced. Pylant then sued Escambia for $35,891.19, the value of 20,989 ties at $1.71 a tie, and for $3,717.19, an undisputed amount owed Pylant by Escambia. Pylant makes two contentions: (1) That ties which passed the first inspection and were stacked in Escambia's yard were not subject, after seasoning, to a second inspection; (2) That the inspection agency on the second inspection improperly rejected seasoned cross-ties, particularly in applying to the seasoned ties AREA specifications for green ties.

The case was tried without a jury. The district judge found that the agreement provided for two inspections and that there was no evidence that Escambia had wrongfully relied on the advice of A. W. Williams Company in rejecting the ties. Pylant's claim of $35,891.19 for the value of the replaced ties was denied. A judgment of $3,717.19, the undisputed sum for ties not involved in this controversy, was entered in favor of Pylant. Pylant's motion for a new trial was denied.

On appeal, Pylant makes three main points: (1) the district court erroneously construed the existing contract; (2) the district court erred in ruling out customs and usages showing the proper application of AREA specifications; (3) Escambia and Pylant were joint adventurers.

■ As shown in the quoted language, the original contract explicitly calls for a first inspection and a final in-

upon being notified by Escambia of such rejects, then Pylant shall replace such cross-ties with another green or dry cross-tie conforming to specifications and acceptable to the inspection agency, without cost to Escambia, and shall furnish bond in amount of $15,000.00 to guarantee such replacements of defective ties; in event such bond shall be insufficient for such purpose, Pylant, upon written demand, shall forthwith and immediately pay to Escambia such additional sum as Escambia may be required to expend to

replace said defective cross-ties; that after delivery to Escambia and acceptance by inspection agency of 269,000 ties for treatment, prior to January 15, 1955, then all liability under such bond and this supplement shall cease to exist.

"2. That all of the terms, provisions, conditions and limitations of the Original Agreement, except as supplemented, amended and modified by the provisions of Section 1 hereof, shall remain in full force and effect."

spection. It seemed clear to the district judge, and it is clear to us, that nothing in the supplemental contract altered the requirement of two inspections. On the contrary, the language from the supplement quoted above recognizes that the ties must not only meet the AREA specifications for green ties but must also be "acceptable to the inspection agency * * * upon completion of the air-seasoning period". The proviso in the supplement states that "all the terms, conditions and limitations of the Original Agreement, except as supplemented, amended and modified by the provisions of Section 1 hereof, shall remain in full force and effect." The provision controls, in the absence of any stipulation permitting or requiring only one inspection. As we see it, acceptance of the green ties under the AREA specifications on the initial inspection did not preclude the parties agreeing to a second inspection of seasoned ties, using the AREA specifications for green ties as a guide in inspecting the seasoned ties. The supplement provides that "Pylant warrants that all of said green cross-ties shall conform to specifications of the American Railway Engineering Association, *and* shall be acceptable to designated inspection agency *under these specifications* upon completion of the air-seasoning period, and that in the event any of the said cross-ties shall not be acceptable to the inspection agency *under these specifications* at any time before or at the end of the period of air-seasoning * * * Pylant shall replace such cross-tie with another green or dry cross-tie *conforming to specifications* and acceptable to the inspection agency. * * * " (Italics added.) The italicized words refer to AREA specifications.

A split in a green tie grows larger as the tie seasons. A green tie with a five-inch split will pass AREA specifications. By the time the tie dries the split will be much longer, and an acceptable green tie might be completely unacceptable if the five-inch criterion were used as a guide

in inspecting dried ties. The term "under these specifications", however, has no frame of reference except as AREA specifications. It seems to us, therefore, that the parties agreed to apply to seasoned ties the "rigid criteria" applied to green ties. This is consistent with the purposes of the contract. It was well understood between the parties, and borne out in the evidence, that the ties were of an unusual size and that Mozambique required ties of unusually high quality.

■ Pylant argues that A. W. Williams Company rejected ties arbitrarily and unreasonably imposing requirements that went even beyond AREA specifications. We do not find, nor did the district judge find, evidence to support this contention. Millard Joseph, the inspector for A. W. Williams Company who made both the first and second inspection of most of the ties in controversy, testified that he rejected ties only if the split extended beyond six inches. One of Pylant's expert witnesses, General Murrow, estimated that fifty per cent of the seasoned ties rejected would have been acceptable to American railroads. This is beside the point; his testimony made clear that ties were rejected at the end of the seasoning period because there were splits of more than five inches, the maximum permissible length for splits in green ties under AREA specifications. The record does not support Pylant's contention that the inspectors applied more stringent requirements for seasoned ties than the AREA specifications set up as a standard for green ties.

In considering the final inspection the district court found no evidence to support any claim that Escambia "wrongfully, dishonestly or unjustifiably relied on the advice of the inspector in rejecting ties". The district court very properly gave weight to the fact that the inspection company was the paid agent of Mozambique, the ultimate user. It was an independent company with no interest in Escambia or Pylant. In view of the strong language by which

the parties agreed that the inspections would be conclusive and binding, Pylant has fallen far short of showing that there were any arbitrary or unreasonable rejections of ties.

Pylant contends that testimony concerning customs and usages in connection with AREA specifications should have been admitted by the trial judge. Despite the ruling, the record contains a great deal of testimony by experts concerning customs and usages. The testimony is of no aid and comfort to Pylant. Here, it is of no importance that customs and usages would show that usually there is no inspection of seasoned ties or a second inspection under AREA specifications: the parties are free to set up standards in the contract that are more stringent than those imposed by customs and usages. Evidence of customs and usages however cannot be used to vary the written terms of a contract. Edward E. Morgan Co. v. United States, 5 Cir., 1956, 230 F.2d 896, 60 A.L.R.2d 455, certiorari denied, 351 U.S. 965, 76 S.Ct. 1030, 100 L.Ed. 1485. In order for a usage to be read into a written contract, it must be consistent with the term of the writing. New Roads Oilmill & Mfg. Co. v. Kline, Wilson & Co., 5 Cir., 1907, 154 F. 296. Usage cannot be incorporated into a contract, if the usage is inconsistent with terms of the contract. Moran v. Prather, 1875, 23 Wall. 492, 90 U.S. 492, 23 L.Ed. 121.

We attach no importance to the argument that title passed to Escambia on the delivery of the ties to Escambia's yard. If title passed, it was for convenience only, as is evidenced by the fact that Escambia made a "loan" to Pylant of a sum equal to the value of each tie. Assuming a transfer of title, rejection of a tie for failure to pass inspection, operated as a condition subsequent, reinvesting title in Pylant. In any event, the parties contemplated a second, and final inspection to cover seasoned ties; only after this inspection and upon acceptance was title vested in Escambia under the contract.

The district court found that the evidence was insufficient to show that Pylant and Escambia were joint adventurers. Pylant's ground for attacking this finding is predicated upon the testimony of Mr. Charles Soule, vice-president and general manager of Escambia, that "this was really a joint venture." There are no allegations in Pylant's original complaint that Pylant and Escambia were joint adventurers. There is nothing in the contracts or in the relationship of the parties to indicate that the parties were joint adventurers. Pylant furnished the rough ties and was paid for them. Escambia treated them and sold them to Mozambique. There was no sharing of profits, no joint control, and no incident of the relationship between them that suggests a joint venture.

The judgment of the district court is affirmed.