230 F.2d 896
 60 A.L.R.2d 455
 EDWARD E. MORGAN CO., Inc., Jones & Gillis, Incorporated,
and United States Fidelity and Guaranty Company, Appellants,
v.
UNITED STATES of America, for Use and Benefit of W. O.
PELPHREY, Appellee.
 No. 15650.
 United States Court of Appeals Fifth Circuit.
 Feb. 23, 1956.
Rehearing Denied March 23, 1956.
 
 William Harold Cox, Jackson, Miss., Hilton E. Howell, Waco, Tex., Naman, Howell & Boswell, Waco, Tex., of counsel, for appellants.
 J. W. Crosland, Dallas, Tex., Peeler Williams, Jr., Sleeper, Boynton, Darden & Burleson, Waco, Tex., Ritchie, Ritchie & Crosland, Dallas, Tex., for appellee.
 Before TUTTLE, CAMERON and JONES, Circuit Judges.
 JONES, Circuit Judge.
 
 
 1
 The appellants, Edward E. Morgan Company, Inc., and Jones & Gillis, Incorporated, herein referred to as the prime contractors, entered into a contract with the United States of America for the construction of runway, taxiway and parking apron extensions at the Gray Air Force Base near Killeen, Texas. A construction bond was given by the prime contractors with the appellant, United States Fidelity and Guaranty Company, as surety. The contract was on a unit price basis. A schedule of designations and unit prices was annexed to and made a part of the contract. In this schedule there was included as Item No. 4, Crushed Stone Base Course of an estimated quantity of 30,500 cubic yards at a price of $2.17 per cubic yard. Included as paragraph 7-14 of the specifications of the contract was the provision:
 
 
 2
 'The unit of measurement for base course shall be the cubic yard, measured in place and computed by the average end-area method, for the quantity of completed and accepted base course as determined by the contracting officer.'
 
 
 3
 Following the above we find this provision:
 
 
 4
 'The quantities of base course, determined as specified in paragraph 7-14, will be paid for at the contract unit price for 'Crushed Stone Base Course', which payment shall constitute full compensation for the construction and completion of the base course, including the preparation of the subgrade, the furnishing of all materials, supplies, equipment, and tools; the handling, manipulating, placing, shaping, compacting, rolling, finishing, and correcting unsatisfactory areas; the furnishing and applying of water; and the furnishing of all other labor and incidentals necessary to complete the work required by this section of the specifications.'
 
 
 5
 The use plaintiff, W. O. Pelphrey, whom we will call the subcontractor, submitted a letter offer dated April 7, 1953, to the prime contractors in which he proposed:
 
 
 6
 '* * * to furnish all equipment, tools, labor, and incidentals necessary to excavate and crush a minimum of 40,000 C.Y. (cubic yards) of Edwards Limestone * * * At your option, the material will be stockpiled or delivered to your handling units from our bins, provided the hauling units you choose can clear our bins without alteration thereto. * * * This work to be performed in accordance with specifications and to meet the screen analysis of the specifications. * * *
 
 
 7
 'For the above work we quote 1.01 per C. Y. Partial payment to be made by the 10th of each month. Final payment 15 days after completion of job.'
 
 
 8
 By a letter dated April 13, 1953, from the prime contractors to the subcontractor, the offer was accepted. The pertinent portions of the acceptance are:
 
 
 9
 'We herewith accept your proposal of April 7, 1953, to crush the rock for the extension of the Gray Air Force Base Runway and Taxiways.
 
 
 10
 'You will also be governed by the same regulations, as to wages, etc., that we are under the terms of our contract.'
 
 
 11
 Although not mentioned in either of the letters comprising the contract between the prime contractors and the subcontractor, some of the rock crushed by the subcontractor was used in the construction of a perimeter road for which the prime contractors were paid on a square yard basis. Some of the rock was used in construction of or at a fire station but there is no evidence showing how much was so used nor the manner of computing the prime contractors' compensation. The rock for the perimeter road was an extra under the prime contract and probably the same was true of that used at the fire station.
 
 
 12
 The prime contractors employed D. E. Goetes (sometimes in the record spelled 'Goates' and as 'Goetz') to haul the rock crushed by the subcontractor to the site of the work in dump trucks, each of which, the evidence showed, held five cubic yards. Goetes was paid for hauling 3090 cubic yards to the perimeter road and fire station, and 44,890 cubic yards to the Gray Air Force Base Project. By dump truck measurement the subcontractor crushed and delivered 47,980 cubic yards of stone.
 
 
 13
 On June 26, 1953, the subcontractor submitted to the prime contractors an estimate for the period through June 25, 1953, based upon the crushing of 30,730 cubic yards of stone. On July 1, 1953, the prime contractors sent to the subcontractor an estimate showing 14,863 cubic yards of stone for runways and taxiways and 2,000 cubic yards of stone for the perimeter road, which estimate was only for the period ending June 15, 1953. This estimate was transmitted to the subcontractor by a letter from the prime contractors advising that the figures were taken from the estimate of the U.S. Engineers and were approximate only. The letter stated that the work for the period June 15th through the 25th would come through on the July 25th estimate. The records of Goetes show that he hauled 15,310 cubic yards through June 13, 1953. If to this we add the 1,655 cubic yards which the subcontractor's books show were delivered on June 15, 1953, we have 16,965 cubic yards, a figure not greatly in excess of the 16,863 cubic yards of the U.S. Engineers' approximate figures. With the letter was a check for $17,031.63 in payment for crushing 16,863 cubic yards of stone at $1.01 per cubic yard.
 
 
 14
 The work of the subcontractor was completed on July 11, 1953. On July 24, 1953, he billed the prime contractors with mining and crushing 47,980 cubic yards of stone at the contract price of $1.01, or $48,459.80, upon which he credited the payment of $17,031.63, leaving a balance, as shown by his invoice, of $31,428.17. The army engineers estimated that there were 31,187 cubic yards of crushed stone in the runways, taxiways and parking aprons, and 2,415 cubic yards of crushed stone in the perimeter road, or a total of 33,602 cubic yards, measured in place as required by the contract between the United States and the prime contractors. The prime contractors, using the 'in place' measurement, determined the total amount payable under the subcontract to be $33,938. Payment was tendered on this basis. Subsequently the prime contractors offered payment based on 40,000 cubic yards of crushed stone, the minimum quantity as specified in the letter agreement. The tender was refused. For the amount claimed by the subcontractor credit being given for the interim payment, action was brought under the Miller Act, 40 U.S.C.A. § 270a et seq.
 
 
 15
 The subcontractor had a check of the prime contractors for $22,374.44 which bore a notation that it was in full settlement. He asked the prime contractors for authority to use the check without prejudice. The request was refused. The check was tendered into the registry. of the court. During the trial and while the subcontractor was on the stand as a witness in his own behalf he endorsed the check so as to make it payable to the clerk.
 
 
 16
 Considerable evidence was introduced, including testimony that there was a custom or usage in Texas that crushed stone was bought and sold by loose truck measurement. Instructions were requested by the prime contractors that doubts as to the meaning of the term 'C.Y.' or 'cubic yard' should be resolved against the subcontractor, and that the jury should find for the prime contractors unless the subcontractor proved that both parties intended that the subcontractor should be paid by loose truck measurement and not by U.S. Engineer estimates of rock in place as the prime contractors were paid. The prime contractors also asked for a peremptory instruction based upon the endorsement in court of the check which bore the 'full settlement' notation. The requested instructions were refused. The court submitted to the jury a special issue as to whether it was the intent of the parties that the subcontractor should be paid for the rock crushed by him on the basis of 'cubic yard truck measurement.' The jury gave an affirmative answer to the question and the court entered judgment for the subcontractor. Before us the prime contractors urged that the special issue should not have been submitted and that as submitted it was leading in form and without adequate instructions as to the burden of proof; that evidence of the usage of custom prevailing in Texas as methods of measuring crushed stone should not have been received; that there was an accord and satisfaction resulting from the endorsement of the check; and that the subcontract provided for the same basis for measurement and payment as the prime contract.
 
 
 17
 The district court did not err in submitting to the jury the question calling for a special verdict. This practice is authorized by Rule 49, Fed.Rules Civ.Proc. 28 U.S.C.A. The court defined 'preponderance of the evidence' and submitted the question 'Do you find from a preponderance of the evidence, if any, that at the time the contract sued upon was entered into, it was the meaning and intent of the parties thereto that W. O. Pelphrey was to be paid for the limestone rock crushed by him on the basis of $1,01 per cubic yard truck measurement? Answer 'Yes' or 'No'.' The Court then charged that the jury was the exclusive judge of the facts proven, of the credibility of witnesses and the weight to be given their testimony. The question propounded was brief, it called for a categorical answer. It posed a narrow question and a question of fact. There was not a mixed question of law and fact such as had our disapproval in Jackson v. King, 5 Cir., 1955, 223 F.2d 714. The instructions to be given by the court as a guide to a jury in returning a special verdict will, as in the case of a general submission, very with each situation of fact and law. The instructions given in this case were adequate. Neither the form of the question nor the accompanying instruction confused or misled the jury. See 5 Moore's Federal Practice, 2207 et seq.
 
 
 18
 The admission of evidence for the purpose of showing a usage or custom prevailing in Texas as to the selling of crushed rock by loose truck measurement is assigned as error. It is urged that the custom was not pleaded and therefore ought not have been the subject of proof. The contention is made that there was no showing that the prime contractors knew of the custom and hence were not to be bound by it. The prime contractors assert that the subcontractor's letter proposal was accepted by them in Mississippi with the result that there the contract was made so that if any custom applied, which is denied, it should be the custom or the absence thereof, prevailing in Mississippi rather than Texas usage or custom, and that the availability and effect of evidence of custom and usage should be determined by the rather strict law of Mississippi rather than the more liberal Texas rule. And it is further contended that because of the provision that the 'work shall be done according to specifications and to meet the screen analysis of the specifications', there is an express incorporation into the subcontract of the prime contract provisions as to measurement of the crushed stone in place, and, it is urged, that because it is a subcontract with which we are concerned, the prime contract provisions rather than usage or custom will be the guide to interpretation in resolving ambiguities if any there be. The subcontractor, say the prime contractors, should be paid according to the formula, applicable to the prime contractors, of measurement in place as fixed in the agreement between them and the United States.
 
 
 19
 Edward E. Morgan Company, Inc., a Mississippi corporation, was one of the prime contractors. E. E. Morgan, as a witness in the case, was asked, 'Your company was Edward E. Morgan Co., Inc., was it not?' He answered 'Yes, sir.' He was asked, 'That's a personally owned company, is it not?' He answered 'Yes sir,' and went on to testify that Jones & Gillis, Incorporated, the other prime contractor, was a personally owned company, owned by R. H. Jones and M. D. Gillis. He testified that this was his first job where crushed stone was used, that he had no knowledge of any custom prevailing in Texas regarding the manner of measurement of crushed stone and made no inquiry as to any such custom. This evidence was introduced for the purpose of overcoming any inference that the prime contractors must have known of the custom. No showing was made as to the knowledge of the custom by Messrs. Jones and Gillis. The prime contractors had an office at Killeen, Texas, at the time of the subcontractor's proposal, and it was to this office for the attention of Mr. G. L. Thorn that the letter proposal of the subcontractor was directed. The acceptance, over the signature of Mr. Morgan, was sent from Jackson, Mississippi, and a copy of it went to Mr. Thorn at Killeen, Texas. In the acceptance the prime contractors directed the subcontractor 'to contact our Mr. G. L. Thorn at Gray and work out the details for doing the work.' It cannot be said that it has been made to appear that the prime contractors were without knowledge of the custom in Texas that crushed stone was sold and purchased by loose truck measurement. The witness, E. E. Morgan, testified only as to his own lack of knowledge, not with respect to his associates. Absent proof that there was no knowledge of a party to an agreement of a custom which might interpret its meaning, the existence of such knowledge will be imputed to the parties. Smith v. Smith, Tex.Civ.App., 234 S.W. 419.
 
 
 20
 Objections were interposed by the prime contractors to the evidence offered by the subcontractor regarding the custom of measuring rock and gravel sold from bins because it was not pleaded. The court overruled the objection and gave leave to amend. The amendment was filed. We see no error. Fed.Rules Civ.Proc. rule 15.
 
 
 21
 We think it is unnecessary to decide whether a federal district court sitting in Texas in a case where jurisdiction is not based on diversity of citizenship should resolve a conflict of laws question by the law of the forum, i.e., Texas, or by a general rule or federal doctrine. Such a question was posed by the United States Supreme Court in D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956, and by this court in Fahs v. Martin, 5 Cir., 1955, 224 F.2d 387. In neither case was the court required to decide the question, nor does such necessity exist here. By the Texas law a contract made in one state and to be performed wholly in another is to be governed by the law of the place of performance. Cockburn v. O'Meara, 5 Cir., 1944, 141 F.2d 779, and cases therein cited. Such also is the rule announced by the Supreme Court of the United States. Andrews v. Pond, 13 Pet. 65, 38 U.S. 65, 10 L.Ed. 61; Miller v. Tiffany,1 Wall. 298, 68 U.S. 298, 17 L.Ed. 540; Scudder v. Union National Bank, 1 Otto 406, 91 U.S. 406, 23 L.Ed. 245; Pritchard v. Norton, 16 Otto 124, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104; Hall v. Cordell, 142 U.S. 116, 12 S.Ct. 154, 35 L.Ed. 956. The rule is applied in admiralty, an exclusive federal sphere. Louis-Dreyfus v. Paterson Steamships, 2 Cir., 1930, 43 F.2d 824, 72 A.L.R. 242. The law of the place of performance governs whether our problem be one of performance of the contract or payment of the amounts due under it. 11 Am.Jur. 423, et seq., Conflict of Laws ss131, 132. Hence we look to the law of Texas rather than to the law of Mississippi for our guide in determining the admissibility of evidence as to the usage or custom.
 
 
 22
 The well settled doctrine that custom or usage will not vary the terms of a written contract needs no citation in its support. But evidence of custom and usage may supply the meanings of words or phrases and supply by implication necessary provisions with respect to which the written instrument is silent. The Texas law has been thus stated:
 
 
 23
 'A valid usage or custom concerning the subject matter of a contract, knowledge of which may be imputed to the parties, is, according to a general rule, incorporated into the contract by implication. This means that where there is nothing in the agreement to exclude the inference, the parties are presumed to have contracted with reference to the usage, provided that it is just and reasonable, and evidence of the usage is admissible, not to vary or contradict the terms of the contract, but to aid in interpreting it and to ascertain with greater certainty what was intended. When an agreement is silent or obscure as to a particular subject, the law and usage become a portion of it and constitute a supplement to it and interpret it. * * *
 
 
 24
 'It follows from what is said above that if the language of a contract is ambiguous, uncertain, incomplete or inconsistent, evidence of usage or custom is admissible to show the meaning intended by the parties.' 42 Tex.Jur. 843-844, Usages and Customs, §§ 14, 15.
 
 
 25
 The foregoing rule has been recognized by this court. Eustis Packing Co. v. Martin, 5 Cir., 1941, 122 F.2d 648; Black v. Interstate Commerce Commission, 5 Cir., 1948, 167 F.2d 825. Neither the letter proposal nor the letter acceptance specifically provides that the quantity of crushed stone should be determined by measurement in place by the United States Engineers, as contended by the prime contractors, or by loose truck measurement, as claimed by the subcontractor. The evidence of custom and usage is admissible to supply that which the writings omit.
 
 
 26
 The prime contractors, in asserting that the subcontract provision, 'this work to be performed in accordance with specifications and to meet the screen analysis of the specifications', incorporates into the subcontract the prime contract provisions for measurement of the crushed rock, would give to the words a meaning that we cannot find in them. We regard the quoted language as relating to the manner of the performance of the work, not the manner of measuring the quantity of rock delivered by the subcontractor nor the basis for computing the amount to be paid to the subcontractor. If these matters are to be governed by the prime contract provisions it must be by reason of something other than a requirement for the manner of performance of the work. It is apparent that the undertakings of prime contractors to the United States with respect to the crushed rock is not at all the same as the obligation assumed by the subcontractor to the prime contractors. The prime contractors agreed to make runways, taxiways, an apron, and a roadway and in so doing to furnish crushed rock in place, packed and tamped, for which it was to be paid by measurements in place. The subcontractor agreed to deliver crushed rock 'stockpiled or delivered to your handling units from our bins'. The contract of the prime contractors called for the delivery of a finished product or something closely akin to it; the subcontractor was a supplier of raw material. In the prime contract it was estimated that 30,500 cubic yards of crushed rock in place would be needed on the job. It was shown that there was a shrinkage of approximately one-third between loose crushed rock, such as the subcontractor furnished, and the rock packed and measured in place under the prime contract provisions. It would, therefore, have required 45,750 cubic yards of loose crushed rock to meet the prime contract estimate. The minimum stipulated in the subcontract was, as has been noted, 40,000 cubic yards. 44,890 cubic yards, by loose truck measure was delivered to the air base job and the remainder of the rock supplied by the subcontractor went to the perimeter road. The parties contemplated that more than 45,000 cubic yards of stone, loose truck measure, would be required, but that only 30,500 cubic yards, measured in place, would be required.
 
 
 27
 We cannot reach a conclusion other than that the parties intended that the subcontractor should furnish 40,000 cubic yards of crushed stone, measured by loose truck measurement, and as much more as might be required to provide the 30,500 cubic yards or more, measured in place, and that payment was to be made on the truck measure basis rather than being measured in place. Looking at the two letters comprising the subcontract, and at the provisions of the prime contract, examining the testimony as to the acts of the parties and as to the usage and custom in Texas of measuring loose crushed rock, we find the judgment to be a proper one. We do not find prejudicial error. The judgment is
 
 
 28
 Affirmed.
 
 
 29
 CAMERON, Circuit Judge (dissenting).
 
 
 30
 Reversible error was, in my opinion, committed by the Court below in more than one particular. Its error in receiving and attributing such determinant force to the evidence of custom is so obvious and prejudicial that I will discuss that error alone in this dissent.
 
 
 31
 The battle below was pitched on the question whether the number of cubic yards furnished appellants by appellee was to be determined according to the measurement-in-place method, upon which the Government paid appellants, or by loose-truck measurement, under which appellant paid the subcontractor who did the hauling of the crushed stone. The Court below admitted, over appellants' objection, evidence of custom relating to this controversy which turned out to be the most important factor in answering this crucial question. The Court below erred, in my opinion, in admitting the evidence at all and in letting a jury verdict rest upon it.
 
 
 32
 Evidence of custom is valuable in determining the meaning of words provided it satisfies certain minimal requirements. These are thus stated in 55 Am.Jur., Usages and Customs, Sections 7 and 23-4, which text is cited with approval in the Texas case of Whitfield Transportation Co. v. Border Truck Lines, infra:
 
 
 33
 '* * * It is a well-established rule, in the absence of anything to show actual knowledge of a party of the existence of a usage or custom, or an actual assent to be bound thereby, that a usage or custom, in order to be binding, must be general in its operation, or at least so general and universal in character that knowledge of it essential to the binding effect upon the party to be charged may be presumed. (p. 269) * * *
 
 
 34
 '* * * The rule is usually stated to be that it will be sufficient to show that a custom is so general as to justify the presumption that the person sought to be bound thereby by had knowledge of the same. (p. 283)
 
 
 35
 '* * * Usages of trade are not recognizable in law unless they have the essential elements of certainty, notoriety, and continuity, bringing themselves home to the knowledge of those who are concerned in the trade or business to which they pertain. In order to create even a prima facie presumption that a party has knowledge of a usage incident to a particular business about which he is engaged, the usage must be shown to be a general one in that business, of such sort as that it would be unreasonable to suppose he was ignorant of it. * * *' (p. 284)
 
 
 36
 And, in the same text, on page 287 (Sec. 27), it is noted that '* * * evidence as to usages and customs is received with caution * * *.'
 
 
 37
 The limitations of those requirements are recognized in Texas and are well stated in the recent case of Whitfield Transportation Co. v. Border Truck Lines, Tex.Civ.App.1954, 271 S.W.2d 706, 708 (writ of error refused), which quotes from 5 Tex.Jur. pp. 1025-6, Sec. 15:
 
 
 38
 'Before such liability can be enlarged by usage and custom it must appear (from) clear and satisfactory evidence that such usage and custom was well established and so notoriously or generally known that the contracting parties knew or were charged with knowledge thereof (55 Am.Jur. pp. 282-283, Secs. 21, 22) so that in the absence of any expression to the contrary it may be assumed that the parties understood that such usage and custom was to be incorporated in their contract.'
 
 
 39
 This seems to be the last word from Texas on the subject and is much more to the point than the old case of Smith v. Smith, referred to in the majority opinion. These minimal requirements should be interpolated into the quotation in the majority opinion from 42 Tex.Jur. pp. 843-4 so as to define the circumstances which control the clause in that quotation reading: "knowledge of which may be imputed to the parties'.'
 
 
 40
 The evidence here fails to measure up to those standards. Appellee himself did not take the stand to testify that there was such a general custom or to assert knowledge of such a custom or to impute knowledge to appellants. Appellant, Morgan, testified categorically that he had no knowledge of any such custom. Appellee did not offer any testimony tending to bring home knowledge of such a custom to appellants.
 
 
 41
 The there witnesses whom appellee introduced testified, in response to leading questions, that there was a general custom in effect in the State of Texas of such terms as to support appellee's contention. But they did not relate that custom to the place where this contract was entered into or to the place where it was to be performed. They did not give any testimony tending to show that the custom was notorious or that it was generally known in the trade in the area. There was no clear or satisfactory evidence from which the jury could have found that there was such a custom of such general notoriety that it would be unreasonable to assume that appellant did not have notice of it.
 
 
 42
 Nor was there any proof of uniformity. The proof tended to show the contrary. Two of the witnesses testified that, where the crushed stone was transported on railroad cars, the weight of the shipment and not the volume was taken as determining the number of cubic yards. It is clear, in my opinion, that the appellee failed to produce evidence which was clear and satisfactory on the point.
 
 
 43
 The evidence of custom was not received in obedience to procedural requirements. The trial was begun on March 7th. Appellee as plaintiff put on his proof, appellants as defendants put on their proof, and both sides rested; whereupon appellee brought in, as if in rebuttal, the three witnesses mentioned. The question of custom had not theretofore been adverted to in the testimony either of appellee or appellants. The right to introduce this evidence in rebuttal or at all was contested by appellants at every step. Appellee finally recognized that so important a provision in the contract should have been dealt with in the pleadings, and filed an amendment to the complaint; but that was not done until March 10th, the day after all of the evidence was in and the record showed no order of Court permitting the amendment. Even under the liberal provisions of Rule 15, the evidence was not permissible.
 
 
 44
 Finally, the Court below erred in refusing to instruct the jury, as seasonably requested by appellants, with respect to the eleventh hour reliance placed by appellee upon custom to supply one of the important ingredients of his case. These requests asked that the jury be instructed that, if the evidence on the question of method of measurement of each cubic yard was evenly balanced, that issue should be resolved in favor of defendants; that the ambiguity, if any, resulted from an instrument written by appellee and that any doubt resulting from the terms used should be resolved in favor of appellants unless appellee had established his version by the greater weight of the evidence. These requested instructions were all clear and proper statements of the law and should have been given. The error in refusing them was clearly prejudicial in view of the fact that the Court did not give the jury any instructions at all as to standards by which they should be guided in determining this question. The leading question put to the jury by the Court[1] did not mention appellant's theory of measurement. Following immediately after the inadequate but nevertheless emphasized evidence of appellee about custom, this placed appellants at a distinct and prejudicial disadvantage. It is my opinion that the judgment of the Court below should be reversed.
 
 
 45
 Rehearing denied: CAMERON, C.J., dissenting.
 
 
 
 [1]
 'Do you find from a preponderance of the evidence, if any, that at the time the contract sued upon was entered into, it was the meaning and intent of the parties thereto that W. O. Pelphrey was to be paid for the limestone rock crushed by him on the basis of $1.01 per cubic yard truck measurement?'