R. P. FARNSWORTH & CO., Inc., Appellant,

v.

TRI-STATE CONSTRUCTION CO. et al., Appellees.

No. 17486.

United States Court of Appeals
Fifth Circuit.

Oct. 27, 1959.

Rehearing Denied Dec. 1, 1959.

Cameron, Circuit Judge, dissented.

& Hester, Savannah, Ga., of counsel, for appellant.

John E. Simpson, Savannah, Ga. (Hitch, Miller & Beckmann, Savannah, Ga., of counsel), for American Houses, Inc.

William H. Schroder, T. M. Smith, Jr., Roy S. Drennan, Atlanta, Ga., Alex A. Lawrence, Savannah, Ga. (Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., Bouhan, Lawrence, Williams & Levy, Savannah, Ga., of counsel), for Tri-State Const. Co.

Hugh M. Dorsey, Jr., Atlanta, Ga. (Crenshaw, Hansell, Ware, Brandon & Dorsey, Atlanta, Ga., of counsel), for American Surety Co.

Before RIVES, Chief Judge, and CAMERON and JONES, Circuit Judges.

RIVES, Chief Judge.

This appeal is from two judgments entered upon a jury's verdict against R. P. Farnsworth & Co., Inc.,[1] one in favor of Tri-State Construction Company[2] for the sum of $133,020.80, and the other in favor of American Houses, Inc.,[3] for the sum of $151,142.35. The trial in the district court consumed ten full days, and the record on appeal comprises 1474 printed pages plus many original exhibits.

Farnsworth had entered into a contract with the United States for the erection of a family housing project[4] at Fort Stewart, Georgia, under which Farnsworth would be paid a total of $6,230,-100.00. This contract, dated February 27, 1957, contemplated the erection of seventy-four multiple-unit dwellings—forty of one type and thirty-four of another type. The original contract called for conventional construction, that is, construction on the site from raw materials with no prefabricated parts.

American interested Farnsworth in using American's prefabricated units, and introduced Tri-State as a local contractor experienced in installing Ameri-

R. Emmett Kerrigan, Ralph L. Kaskell, Jr., New Orleans, La., Perry Brannen, Savannah, Ga., Deutsch, Kerrigan & Stiles, New Orleans, La., Brannen, Clark

1. Hereinafter called Farnsworth.
2. Hereinafter called Tri-State.
3. Hereinafter called American.
4. Under 12 U.S.C.A. § 1748 et seq.

can's prefabricated materials. The Corps of Engineers, representing the United States, agreed to the switch over from conventional to prefabrication type of construction, provided show drawings were submitted showing how this was to be accomplished and "pilot" [5] buildings were erected.

Under date of March 18, 1957, Farnsworth and American entered into a contract designated as a "Purchase Order," whereby American would provide the carpentry materials to the job, after they had been prefabricated at its plant, at a total price of $860,178.00. As of the same date, Farnsworth and Tri-State entered into a contract whereby Tri-State was to erect the carpentry materials on the job at a price of $191,466.30. Mr. McMaster, Farnsworth's construction engineer on the job, testified that a fair approximation would be that one-fifth of the work on the job would be done by Tri-State and American and the remaining four-fifths by Farnsworth or by other subcontractors.[6]

One of the principal points of controversy is the extent, if any, of the responsibility of Tri-State for performance by American, and of American for performance by Tri-State. Farnsworth's position, with which Tri-State and American do not agree, is that the contracts between Farnsworth, Tri-State and American were integrated and complementary and that Tri-State and American together agreed to provide Farnsworth with a finished product, complete and in place, in accordance with the contract between Farnsworth and the United States. We shall hereafter revert to that phase of the controversy when we come at some length to construe the contracts.

In any event, there were never any finally approved shop drawings showing the deviations in construction made necessary because of the switch from conventional to prefabrication, nor were the pilot buildings completed in time to serve as a guide. As a consequence, and also as the result of some delay by Farnsworth in the forming and laying of the concrete slabs and foundations on which the buildings were to be assembled and erected, Tri-State performed an unusually large amount of work not contemplated at the time of its contract with Farnsworth. Ultimately, Tri-State claimed to be entitled to extra compensation in the amount of $151,341.78.

The contract between Farnsworth and Tri-State provided that, "No alterations or changes shall be made except upon contractor's (that is, Farnsworth's) written order." However, over Farnsworth's objection, Mr. Converse, Tri-State's superintendent in charge of the job, testified that, about the second week in June, Mr. McMaster, Farnsworth's construction engineer, agreed with him that Tri-State was "doing a whole lot of work that wasn't contemplated," and

"* * * in order to expedite the job with the schedule they were trying to drive at for the completion date it would be impossible to get a change order for every item that we felt was beyond our scope of work, which was a great number of them that we were called upon to do. So, in order to expedite the job,

---

5. The project engineer explained:
   "The idea of the pilot building—I mean if it had been regularly constructed we would have put every floor joist where it was shown and every stud where it was shown and so forth, but when they went into prefabrication in making up panels they ran into a little different deal, and what we wanted to see was how these panels were going to fit together while they were being cut and fitted in the field, let us say, in that pilot building so that we could take care of any little discrepancy and so forth, which we would do if

you are cutting boards, you would cut them the right length to fit, wouldn't you. So, all of this stuff came in already made up and so we knew that there were going to be some wrinkles to iron out, and so that is the reason we wanted a model house to see where they were and what they were."

6. It may be observed that the combined contract prices for the work of American and Tri-State was slightly more than one-sixth of Farnsworth's total contract price.

it was his suggestion that we would go ahead and complete these items of work and that we would bill American Houses for items that wasn't any question about American Houses accepting, but that we had only a contract with Farnsworth. We had no contract with American Houses. And that we would look to them for a settlement between Farnsworth and American Houses as to how Tri-State would get paid. In other words, we would get paid, either by American Houses or by Farnsworth."

McMaster denied having had any such conversation. Converse testified that he confirmed his claimed verbal understanding by letter dated June 14, 1957, addressed to Farnsworth, attention of Mc-Master, and reading:

"Gentlemen:

"In line with our recent conversation in regards to the additional work we are being required to do on above subject job. This is to advise that it is our opinion that your suggestion of completing the various items and then submitting our invoice for payment is the proper procedure.

"We realize that with the job demands it would be impracticable to clear all the items as they occur, however there will be numerous items for which we can bill American Houses direct, other items will have to be settled between yourselves and American Houses. As we have only a contract with you, it is imperative that you clear the items as early as possible.

"Yours very truly,
W. K. Converse
Executive Vice President."

Converse testified that he delivered that letter in person by handing it to Mr. McMaster's secretary in McMaster's office. McMaster denied ever having seen the claimed letter. His secretary testified that she had no recollection of the letter having been handed to her, and that she had searched the office files for it but had been unable to find it. Mr. Thornhill, Farnsworth's job superintendent, and Mr. Horlock, Farnsworth's office engineer on the project, testified that the letter had not been called to their attention. There was evidence, also, that Tri-State presented no bill to Farnsworth covering the alleged extras until September 26, immediately after Farnsworth had first placed Tri-State in default for failure to supply sufficient workmen. Converse explained:

"Q. You did not mail copies of those work sheets to Farnsworth during May, June, July and August, isn't that correct? A. That's correct. We mailed them to American Houses in line with what they had requested, that we mail what we could to American Houses, and if they didn't pay it, they would see that we were paid."

Some of Converse's testimony was corroborated by Mr. Winskie, the Government's building inspector on the project:

"On several occasions we found some of the slabs were too large and had to be spliced, and so I got he and Mr. Converse together, Mr. Jack Thornhill, who was the Superintendent, I got them together, and they would agree for Mr. Converse to go ahead and fix it, and I heard Mr. Jack say on several occasions that whatever was right about it, or whatever it took to pay for it, to just go ahead and do it."

Following the first notice of default, a meeting was held in Atlanta, attended by representatives of American, by Mr. Converse, Mr. Oastler (Tri-State's president), Mr. McMaster, and Mr. Kaskell (Farnsworth's attorney). At that meeting, Tri-State presented its pay requisition No. 6 "covering items of work done under our Contract No. CFHFS-C4 and additional items of work required by you" and showing "Due this requisition —$116,560.61." There was no itemization of the "additional items of work." Farnsworth, however, at that time did

not request any itemization, but refused to pay anything not called for by its written contract. Farnsworth was advised in that meeting that Tri-State was financially unable to continue with the work, "that it was impossible for us to continue unless a part or all of it was paid." The notice of default was withdrawn, and American agreed to advance Tri-State an additional $17,500.00, making the total, either paid or advanced by American to Tri-State, $38,879.86. Farnsworth's representatives said that "they would not pay a penny of it." About a week after that meeting, namely on October 4, Tri-State reached the end of its resources and ceased operations at Fort Stewart. Farnsworth completed the work to the satisfaction of the United States.

Tri-State commenced this litgation several months before Farnsworth had completed the project. Counterclaims and cross-claims ensued, followed ultimately by the trial and jury verdict and the judgments against Farnsworth.

We consider Farnsworth's "Specification of Errors" in their order.

"1. The district court erred in charging that the jury should construe and determine the legal effect of the contract documents."

■■ The court undertook to inform counsel of its proposed instructions to the jury prior to their arguments,[7] and then advised counsel that it would charge the jury:

> "The Court will not attempt to exhaustively review or detail the terms and conditions of the aforementioned contracts. These documents are attached to the pleadings which will be given you at an appropriate time and you gentlemen are invited and instructed to refer to

these documents to determine their content."

The court's subsequent charge to the jury embodied that language and contained also the following:

> "Gentlemen, the pleadings will be out with you, as I said just now, not as evidence, but for you to read over and get the exact contentions of the respective parties, if you so desire. Now, of course, the Court has not attempted to outline the contents of these contracts to you, but you are instructed to refer to them directly in order to determine for yourselves their contents and the duties and obligations imposed upon the respective parties."

It would have been better if the court had omitted the concluding phrase, "and the duties and obligations imposed upon the respective parties." The construction of the written contracts was, of course, for the court,[8] though factual issues were presented as to the meaning and purpose of certain technical words and ambiguous terms, such as "pilot house" and "shop drawings."[9] The court's meaning and intent were, however, reasonably clear, that is, to submit to the jury the pleadings and the contracts in order for the jury to see their contents. The error in the use of the concluding phrase is not, in our opinion, sufficient ground for setting aside the jury's verdict and the judgments entered thereon.[10]

"2. The district court erred in giving erroneous charges on the contract documents. (a) The court erroneously construed the integrated agreements as being unrelated. (b) The court erroneously made Farnsworth liable to Tri-State for American's defaults."

7. Compare Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A.

8. O'Brien v. Elder, 5 Cir., 1957, 250 F.2d 275, 278.

9. See, Hawkins v. Frick-Reid Supply Corporation, 5 Cir., 1946, 154 F.2d 88, 89;

O'Brien v. Elder, supra; J. T. Majors & Son, Inc. v. Lippert Bros., Inc., 10 Cir., 1958, 263 F.2d 650, 653, 654; 17 C.J.S. Contracts § 616, p. 1284.

10. Rule 61, Federal Rules of Civil Procedure.

The district court stated several times that Farnsworth had one contract with American and another contract with Tri-State. It also gave to the jury Tri-State's requested charge No. 6, as follows:

"Gentlemen of the jury, in the event you should find that Tri-State has incurred additional expense for labor or materials as the sole and direct result of the failure of American Houses to furnish materials as provided for in the contract between American Houses and Farnsworth, I charge you that Tri-State would be entitled to recover any such expense from the defendant Farnsworth, and in that event Farnsworth in turn would be entitled to recover an equal amount from American Houses."

The district court further instructed the jury:

" * * * in the event you should find that Farnsworth or American Houses has failed to perform work or to furnish materials which they were obligated to furnish or perform in accordance with said contracts, or said purchase order, or that they have defaulted in the proper performance or coordination of work which they were obligated to do or to coordinate, and you further find that such failure or default on their part caused or materially contributed to the failure or inability of Tri-State Construction Company to complete the performance of its subcontract in accordance with its terms, then and in such event neither Farnsworth nor American Houses would be entitled to recover from the American Surety Company, as surety, or Tri-State Construction Company, as the principal, on said performance bond.

"You are also further instructed that, in the event you find that Farnsworth or American Houses was indebted to Tri-State Construction Company for work done on said job and wrongfully refused to pay Tri-State for such work and thereby caused or contributed to the inability of Tri-State to complete performance of said contract, as contended by American Surety Company and Tri-State, then and in that event neither Farnsworth nor American Houses would be entitled to recover from American Surety Company, as Surety, or from Tri-State Construction Company, as principal, on said performance bond."

The contract between Farnsworth and Tri-State and Farnsworth's "Purchase Order" on American were each dated March 18, 1957, though the terms of the "Purchase Order" were not finally agreed on until April 22, 1957. Tri-State agreed to erect the prefabricated materials furnished by American. Pertinent provisions of the contract between Farnsworth (referred to as "Contractor") and Tri-State (referred to as "subcontractor") are set forth in the margin.[11] The

11. "1. Subcontractor shall furnish and pay for all labor, services, and materials and perform all of the work necessary or incidentally required for the completion of that part of the work covered by the Contract Documents, as follows:

"All on-site handling and erection of all materials furnished by American Houses Inc. including, but not limited to, receiving, checking, unloading, storing (if necessary) protecting, erecting, cleaning and bringing the work to the point of final acceptance by the government.

* * * * *

"It is fully understood that the materials furnished to the subcontractor by the Contractor and American Houses Inc. under this subcontract are from delivery to the job site in the control, care and custody of the subcontractor and he shall be responsible for their protection and proper use and handling. * * *

* * * * *

" * * * The shipments of materials are scheduled by the Contractor and American Houses Inc. so that the first pilot buildings will be erected and closed in during the week of April 22, 1957 and and the last unit will be erected and closed in by July 19, 1957. Items which must follow the plaster work and punch list items will be coordinated with the

attached "Purchase Order" by Farnsworth, referred to as "Purchaser," on American, referred to as "Vendor," provides in pertinent part:

" * * * It is understood and agreed that purchaser has entered into a subcontract with Tri-State Construction Co., 114 Ellis Street, N. E. Atlanta, Ga., for the on-job handling and erection of these materials and certain other items of work, (copy of which contract is attached hereto) and vendor agrees to provide purchaser with vendor's letter agreement that this Purchase Order and said subcontract with Tri-State Construction Co. are complementary and integrated and will produce a finished product of the included items of work complete and in place in accordance with the Prime Contract Documents. Vendor further agrees that in the event of default of said subcontractor, Vendor will provide and arrange for another subcontractor to complete the work, at no additional cost to the purchaser, such substitution to be subject to approval of subcontractor's surety. * * * "

On April 4, 1957, American delivered to Farnsworth an "Integration Letter," reading as follows:

"In consideration of the award to us of your purchase order for our

work of other trades in accordance with a schedule to be furnished by the General Contractor. The subcontractor agrees to work in accordance with and to maintain these schedules, provided subcontractor shall neither be responsible for nor required to apply for time extensions on account of delay incurred by failure of American Houses Inc. or the Contractor to make prompt delivery of the items required to be delivered by them to the site.

* * * * *

"17. * * *

"(b) Subcontractor agrees to guarantee its work against all defects of materials or workmanship, as called for in the Contract Documents; or if no guarantee is called for by the Contract Documents, then for a period of one (1) year from the date of completion of said work and the acceptance of the contract by the

furnishing certain material for construction of 388 units of Capehart Family Housing at Fort Stewart, Georgia, which is to be erected under a contract between yourselves and Tri-State Construction Co., Inc., a copy of which is attached to your purchase order, it is mutually understood and agreed that the contract with Tri-State Construction Co., Inc., and the purchase order to us are complementary and intend to integrate in such a way as to produce a finished product of all the items shown on plans and specifications attached to the said contract with Tri-State Construction Co., Inc., and the said purchase order to us, and if any deficiency in materials necessary to complete the work in accordance with said plans and specifications shall arise, we will see to it that such deficiency will be supplied.

"If default shall occur in the performance of the contract between yourselves and Tri-State Construction Co., Inc., we shall obtain another contractor in place of Tri-State Construction Co., Inc. at no additional cost to you as approved by the bonding company issuing its bond on the contract between yourselves and Tri-State Construction Co., Inc."

Owner, insofar as said materials and workmanship have been furnished by subcontractor. [The last clause, "insofar as said materials and workmanship have been furnished by subcontractor" was a typed addition to the preceding printed paragraph.]

* * * * *

"This subcontract is awarded in conjunction with and contingent upon a purchase order to American Houses Inc., Allentown, Pa., a copy of which is attached hereto and made a part of this subcontract. It is understood and agreed that the subcontractor is thoroughly familiar with the degree and methods of prefabrication which will be accomplished by American Houses Inc. and that the subcontractor will coordinate his operations with the finally approved shop drawings and materials supplied by American Houses Inc."

Tri-State and American furnished to Farnsworth separate performance bonds with different corporate sureties. About a month after work on the job began,[12] American was added as a co-obligee with Farnsworth on Tri-State's performance bond.

We find no provision whereby Tri-State agreed to assume responsibility for performance by American of American's "Purchase Order." Tri-State limited the scope of its guarantee of materials and workmanship by the typed interlineation, "insofar as said materials and workmanship have been furnished by subcontractor." (See footnote 11, supra.) Tri-State's contract with Farnsworth protected Tri-State from responsibility for American's failure to make delivery according to its "Purchase Order." We conclude that Tri-State's obligations under its contract were limited to its work. The reference in Tri-State's contract with Farnsworth to American's purchase order was simply to describe more clearly the work that was to be performed by Tri-State. Tri-State did not guarantee, nor become responsible for, American's performance. In a similar situation, the Supreme Court has well said:

"The reference in the subcontract to the drawings and specifications was evidently for the mere purpose of indicating what work was to be done, and in what manner done, by the subcontractor. Notwithstanding occasional expressions of a different view * * *, in our opin-

ion the true rule, based upon sound reason and supported by the greater weight of authority, is that in the case of subcontracts, as in other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." [13]

American, by the terms of its "Purchase Order" and by its subsequent "Integration Letter," agreed that its "Purchase Order" and Tri-State's subcontract "are complementary and integrated and will produce a finished product etc." American further agreed "in the event of default" of Tri-State to provide another subcontractor. Before American's responsibility for Tri-State's performance should become operative, Tri-State must have broken its contract with Farnsworth. If default on the part of Farnsworth, making it impossible for Tri-State to continue, was available as a defense to Tri-State, it was available to American also.

We conclude that the construction of the written agreements by the district court was not erroneous.

Moreover, it was for the jury to determine whether or not Tri-State's original contract was modified, as testified by Mr. Converse, so as to provide that additional work might be performed by Tri-State and invoice for payment submitted later, and that Farnsworth would be responsible to Tri-State for payment, if not made by American, then by Farnsworth itself.[14]

12. At the insistence of Farnsworth, but apparently in order to protect American because of its obligation to provide a substitute for Tri-State if Tri-State defaulted.

13. Guerini Stone Co. v. P. J. Carlin, 1916, 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636. To like effect, see Sugarland Industries v. Old Colony Trust Co., 5 Cir., 1925, 6 F.2d 203, 208; Hill & Combs v. First National Bank of San Angelo, Texas, 5 Cir., 1944, 139 F.2d 740, 742; Edward E. Morgan Co. v.

United States, 5 Cir., 1956, 230 F.2d 896, 903, 60 A.L.R.2d 455.

14. Farnsworth does not seek review of the action of the district court in overruling its objections to the admissibility of such evidence. We think that it was admissible under Georgia Code Annotated, Title 38, Sec. 507, and American National Ins. Co. v. Lynch, 1934, 49 Ga.App. 580, 176 S.E. 546, with which Heard v. Dooly County, 1897, 101 Ga. 619, 28 S.E. 986, does not appear to conflict.

We find no reversible error in the court's instructions to the jury complained of in specification of error number 2.[15]

"3. The district court erred in charging the jury (a) that it could find a default on the part of Farnsworth when the uncontradicted evidence showed that Farnsworth was not in default under the contract, and (b) that Tri-State had the right to abandon its contract work if the jury found that Farnsworth had refused to pay for alleged non-contract work."

■ When Tri-State left the job. Farnsworth had made all payments provided for by its original written contract, but had refused to pay for any extras. At the trial, upon cross-examination of Mr. McMaster, Farnsworth conceded that it had agreed to pay for extra items of work in the amount of $11,891.21, for which payment had not been made. As has already been said, it was for the jury to determine whether the contract between Farnsworth and Tri-State had been modified so as to make Farnsworth responsible for payment to Tri-State for all of the extras. The charge specifically complained of in Specification of Error 3 has already been quoted (ante p. 10), and we find no reversible error in the giving of that instruction.

"4. The district court erred in charging that the jury could allow Tri-State to recover for alleged extras without first finding (a) that there was a distinct agreement therefor, and (b) that such alleged extra work was not covered by the original contract."

The charge complained of reads as follows:

"Ordinarily when one renders services to another, which the latter accepts, a promise is implied to pay the reasonable value thereof.

"In this connection, Gentlemen, I charge you that if you find that Tri-State Construction Company has performed services in the form of labor and materials in behalf of and at the instance of the defendant Farnsworth and that these services were received and accepted and were of a benefit to the defendant Farnsworth, and that Tri-State was not in any wise in default, then and in that event, you gentlemen shall determine the reasonable value of the labor and materials furnished, and return a verdict in favor of Tri-State and against the Defendant Farnsworth in an amount properly determined by you."

■ Under Georgia law, Tri-State, if not itself in default, would be entitled to recover in *quantum meruit* for all services performed at the request of and for the benefit of Farnsworth whether required by the original contract or by the claimed subsequent modification.[16]

"5. The district court erred in giving charges requested by appellees which were in conflict with charges given at the request of Farnsworth, and which, in effect, resulted in denying Farnsworth's requests to charge."

■ The district court simply gave all of the charges requested by the parties and that resulted in some conflict, a practice certainly not to be approved. However, the charges requested by the appellees correctly stated the law of the case, and Farnsworth cannot complain of conflicts brought about by its own erroneous requests.[17]

15. It will be noted that two of those instructions (271 F.2d 734) were particularly directed to Farnsworth's and American's counterclaims which sought recovery against Tri-State and its surety on Tri-State's performance bond.

16. Georgia Code Annotated, Title 3, Sec.

107; Collins v. Frazier, 1919, 23 Ga.App. 236, 98 S.E. 188; Weathercraft Co. v. Byrd, 1924, 32 Ga.App. 369, 123 S.E. 180.

17. United States v. Wurtsbaugh, 5 Cir., 1944, 140 F.2d 534, 537; Illinois Central R. Co. v. Griffin, 7 Cir., 1897, 80 F. 278, 282.

We have carefully considered the remaining specifications of error,[18] but find no reversible error in any of the matters complained of. The judgments are therefore

Affirmed.

CAMERON, Circuit Judge.

I dissent.

Rehearing denied: CAMERON, Circuit Judge, dissenting.

18. "The district court erred:

"6. —In making interjected comments while delivering charges requested by Farnsworth, which destroyed the effectiveness of those charges and emphasized the contentions of appellees.

"7. —In permitting counsel for Tri-State to argue in the presence of the jury the correctness or incorrectness of charges which the court had said it would give, and to read excerpts from law books to the jury.

"8. —In committing trial errors so numerous and prejudicial as to deprive appellant of a fair trial.

"9. —In denying Farnsworth's motions for directed verdicts and for judgments n. o. v.

"10. —In denying a new trial."