Stein and another, Appellants, vs. McCarthy, Respondent.

*December 15, 1903—January 12, 1904.*

*Building contracts: Evidence: Intention of parties: Reference to specifications.*

Defendant took a contract to do the entire work of erecting a building according to plans and specifications and the satisfaction of designated architects. Plaintiffs had examined the plans and specifications and submitted to the owner a bid for the plastering at the same time defendant's bid was accepted. Thereafter defendant handed the plans and specifications to plaintiffs and requested a bid, which was given and rejected on account of the proposed price. Thereafter plaintiffs had an interview with defendant's agent which resulted in an agreement as to price, plaintiffs stating that their bid was "for the job" and such agent then stated, "Go ahead and do the work." *Held,* that plaintiffs were bound to do the work to the satisfaction of the superintendent designated in the specifications, and were only entitled to payment upon doing so.

Appeal from a judgment of the circuit court for Dane county: R. G. Siebecker, Circuit Judge. *Affirmed.*

This action was commenced November 7, 1902, to recover

$224.50, the alleged balance due to plaintiffs for services performed and materials used at the request of the defendant in the construction of a number of buildings named, including the "Kappa House," so called, in Madison, between April 1, 1901, and May 1, 1902. The defendant answered by way of admissions, denials, and counter allegations, to the effect that March 11, 1901, he entered into a written contract with the owners of the Kappa House for the erection and construction of a chapter house, to be completed on or before September 1, 1901, and for the payment of $10 a day as liquidated damages for any delay beyond that date, according to plans and specifications made for the same by Ferry & Clas, architects, and signed by the parties; that it was further agreed in the contract that all work should be executed in a thorough, complete, and most workmanlike manner, agreeable to such directions as should be given from time to time by such architects, or by Porter, the local superintendent, employed by the owners for that purpose, and that such work should be done to Porter's full and entire satisfaction; that upon making such contract the defendant, with the consent of the owners, sublet by parol contract to the plaintiffs the plastering work described in such plans and specifications; that the plaintiffs, well knowing all the terms and provisions of such written contract and such plans and specifications, so far as the same pertained to the plastering of the Kappa House, agreed in an oral contract to be bound in all respects by such written contract and by the terms and provisions of such plans and specifications to do such plastering work in accordance therewith; that the plaintiffs failed to furnish such materials or do such plastering as so agreed; and that said Porter declined and refused to certify that such plastering had been done according to the contract, for the reason that the same was not done according to such contract and plans and specifications, and that in doing so he acted honestly and in good faith, and that the plaintiffs delayed the

work to October 1, 1901. December 6, 1902, the defendant offered in writing to permit the plaintiffs to take judgment for $24.57, with interest from May 1, 1902, with costs, which offer was refused. At the commencement of the trial, January 17, 1903, and before any testimony was taken, it was agreed between the parties, in open court, that there was no controversy about any of the work mentioned in the complaint except the work on the Kappa House; that the plaintiffs were entitled to recover the amount demanded in the complaint, unless the same should be reduced by reason of the failure of the plaintiffs to properly conduct the work on the Kappa House. The plans and specifications, among other things, contained the following:

"They [the contractors] shall be subject to the direction of the architects or persons superintending the work . . . and by whose decision they shall abide in all questions as to the true meaning of the drawings and specifications. . . . Each contractor must include in his proposal and contract all the work and materials included in the specifications of the branch he is contracting for, even though it may belong to another branch of work. All materials must be the best of their respective kinds and all work must be executed in the best, most substantial and thoroughly workmanlike manner known to the trade in accordance with the intent and meaning of the drawings and specifications and *to the satisfaction of the architects and person superintending the work.*"

The oral contract of the plaintiffs to do the plastering upon the Kappa House appears to have been made on or about June 15, 1901.

At the close of all the testimony, the court, on motion of the defendant, directed a verdict in favor of the plaintiffs for $24.57, with interest thereon from May 1, 1902. From the judgment entered thereon against the defendant for the amount stated, the plaintiffs bring this appeal.

For the appellants there was a brief by *John C. Fehlandt,*

attorney, and *Rufus B. Smith*, of counsel, and oral argument by *Mr. Smith*.

For the respondent there was a brief by *Olin & Butler*, and oral argument by *John M. Olin.*

CASSODAY, C. J.   The plaintiffs claim that the case was improperly taken from the jury.   This seems to be based upon the theory that their contract made with the defendant through Findorff was separate from, independent of, and without reference to the plans, specifications, and contract which the defendant had previously made with the owners of the Kappa House in respect to the plastering.   If the evidence on the part of the plaintiffs sustains such theory, then the verdict was improperly directed.   The evidence is undisputed, and to the effect that March 11, 1901, the defendant entered into a written contract, including plans and specifications, with the owners of the Kappa House, to erect, construct, and complete the same on or before September 1, 1901, according to such plans and specifications, for $11,441; that, prior to that time, Porter—named therein as local superintendent—notified different contractors in Madison, including the plaintiffs and the defendant, in writing, that such plans and specifications were at his office, and invited such contractors, respectively, to examine the same and send him sealed bids for the different parts of the work; that the plaintiffs, pursuant to such notice, carefully examined such plans and specifications, which were identified by them in evidence, and thereafter sent to Porter their bid for the plastering work; that the defendant sent in a separate bid for the mason work, and also a separate bid for the whole work, and the defendant's bid for the whole work was accepted, and accordingly the defendant made the contract with the owners March 11, 1901, as stated; that subsequently the defendant sent the plans and specifications to the plaintiffs to give him

Stein v. McCarthy, 120 Wis. 288.

a bid on the job; that the plaintiffs then figured up and re-
turned the plans and specifications, and about June 10, 1901,
one of the plaintiffs met the defendant at the Fair Store
block in the presence of Porter, and asked him who was
going to do the plastering on the Kappa House and he re-
plied that he did not consider the figures of the plaintiffs as
any bid at all, and that he was sure that they would not get
the job; that about June 15, 1901, one of the plaintiffs asked
Findorff (a subcontractor of a part of the woodwork at the
Kappa House) who was going to do the plastering on that
house; that Findorff replied by asking why the plaintiffs did
not go and see the defendant and do the plastering; that he
then told Findorff that the plaintiffs would not see the de-
fendant because he had said what he did at the Fair Store;
that the plaintiffs wanted Findorff to help them get the con-
tract before receiving the plans and specifications from the
defendant; that Findorff then told him that he thought the
plaintiffs were a little bit high on the work, and asked if the
plaintiffs would not "do that work for twenty-one and thirty-
five a yard;" that he replied that that would depend on what
was to be done; that Findorff said, "A hard finish;" that he
replied that the plaintiffs could not "do it for twenty-one and
thirty-five;" that Findorff then asked what the plaintiffs
wanted "for back plastering," and he replied, "Thirteen;"
and that in a couple of days afterwards Findorff said, "Go
ahead and do the work."   The plaintiff who had such con-
versation with Findorff testified to the effect that he told Fin-
dorff what the plaintiffs' *"bid would be for that job;"* that
the plaintiffs had previously looked it over "to determine
what" their *"bid would be for that job;"* that they did that
after the contract was let to the defendant; that before put-
ting in their bid, prior to that time, they "looked over the
plans and specifications carefully as to what was required in
the plastering part of it;" that they "knew what the plans
and specifications required as to plastering and lathing;" that

at that time they understood that if their bid should be accepted they would be controlled by such plans and specifications, but that at the time of the agreement with Findorff they did not understand that they were bound by such plans and specifications; that they did understand that *Mr. McCarthy* had the contract for the entire work; that they knew that they were making the contract through Findorff with the defendant, as the other party to the contract; that they knew the plaintiffs were subcontractors; that they did not expect to do the work differently from what the defendant had contracted to do it, and that they were bound by what they had agreed with Findorff; that June 25, 1901, being the next day after the plaintiffs commenced work on the Kappa House they received notice in writing from Porter, as such superintendent, that their lathers were "not carrying out the requirements of the specifications where they call for all outside lathing to be narrow laths, nailed with six galvanized iron cut nails to each lath;" that he should expect the lath then "on to be renailed in order to be satisfactory;" that he showed the letter to Findorff, who said Porter was the superintendent, and that the plaintiffs better do as he had stated; that they understood from that time on that Porter was superintendent, and that the plaintiffs must "do the work under his directions, not to his satisfaction;" that the plaintiffs did not get any certificate from Porter, and never asked for any. August 4, 1901, Porter notified the defendant in writing that the plaintiffs were delaying the work on the Kappa House, and that there would certainly be trouble unless something was done. Two days afterwards the defendant notified the plaintiffs in writing that they would be held responsible for all cost or trouble by reason of such delay. As indicated in the statement of facts, the specifications mentioned required all work to be executed "to the satisfaction of the architects and person superintending the work." The defendant's contract with the owners required all work to be executed in a

thorough, complete, and most workmanlike manner, and agreeably to such directions as should be given from time to time by the architects or Porter, as such local superintendent, and to such superintendent's full and entire satisfaction, without reference thereon to any other person; and it required payment to the defendant by the owners only "on the certificate of the superintendent." It is undisputed that the plaintiffs did not do the plastering to the satisfaction of Porter, and that he refused to give the defendant such certificate by reason of the failure of the plaintiffs to do the work according to such plans and specifications and contract.

The contention that the contract between the plaintiffs and the defendant was made without reference to such specifications and contract previously made between the defendant and the owners of the Kappa House is without foundation. The interviews between Findorff and one of the plaintiffs, which resulted in the making of the contract, were without significance or meaning, except when considered with reference to the prior contract and specifications. They say they told Findorff what the plaintiffs' "bid would be for the job." What job was thus referred to? Certainly the job the plaintiffs had previously looked over "to determine what" their "bid would be for that job." That manifestly occurred about a week before the conversation with Findorff, and after the defendant had sent the plans and specifications to the plaintiffs for the purpose of having them give him a bid on the job. At that time they say they figured and returned the plans and specifications, which figures the defendant rejected at the Fair Store when the defendant informed the plaintiffs that they would not get the job at such figures. It is manifest that the job thus referred to meant the job of lathing and plastering which the defendant had agreed to perform for the owners of the Kappa House. He was bound to perform, or get some one else to perform, that job in accordance with such plans, specifications, and contract. If the work should

be done in any other way it would be of no value to the defendant. This was well known to the plaintiffs for months before the conversation with Findorff. When, at the Fair Store, one of the plaintiffs asked the defendant who was going to do the plastering work on the Kappa House, he manifestly referred to the plastering work described in the plans, specifications, and contract upon which the plaintiffs had figured, and for which they had made an offer to the defendant, which he then rejected. The "job" repeatedly referred to in the conversation with Findorff manifestly referred to the lathing and plastering which such plans, specifications, and contract required to be done by the defendant. Of course it was competent for the defendant to make an entirely different contract with the plaintiffs. But no man of ordinary judgment would be expected to do so under the circumstances stated. The facts admitted by the plaintiffs clearly show that in case they got the job they expected to do the lath and plastering work on the Kappa House according to such plans, specifications, and prior contract, and that the negotiations through Findorff related only to the price to be paid by the defendant for the "job." All other matters and details were manifestly understood to be as stated in such plans, specifications, and prior contract. It is conceded that, had the plaintiffs attempted to enforce a lien against the Kappa House for such plastering work, they would have been bound to take notice of the terms and conditions of the original contract, and been controlled thereby. *Schroeder v. Galland,* 134 Pa. St. 277, 19 Atl. 632, 7 L. R. A. 711; *Shaw v. First Baptist Church,* 44 Minn. 22, 46 N. W. 146; *Shaver v. Murdock,* 36 Cal. 293; *Henley v. Wadsworth,* 38 Cal. 356. Here it stands admitted that the plaintiffs had actual notice of such plans, specifications, and prior contract, and agreed to do such plastering work according to the terms and conditions therein contained. Hence they were bound to do the work to the satisfaction of the architects and Porter, as the local super-

intendent, and they were only entitled to payment upon doing so.

The views expressed make it unnecessary to determine whether it was error for the trial court to hold, as a matter of law, that the plaintiffs were bound to know of the existence of a custom in the city that subcontractors took their contracts subject to the terms and conditions of the contract between the owners and the principal contractor, notwithstanding the evidence tended to prove that the plaintiffs had no knowledge of the existence of such custom. In addition to cases cited by counsel, see *Chateaugay O. & I. Co. v. Blake,* 144 U. S. 476, 12 Sup. Ct. 731. The trial court, however, properly held that, regardless of such custom, the plaintiffs were, as a matter of fact, bound by the terms and conditions of such original contract, and were only entitled to payment upon doing so.

*By the Court.*—The judgment of the circuit court is affirmed.

SIEBECKER, J., took no part.