**WESTINGHOUSE ELECTRIC SUPPLY COMPANY, a division of Westinghouse Electric Company, assignee of the claim of Joseph Zangrilli & Sons, Inc., Appellant,**

v.

**FIDELITY AND DEPOSIT COMPANY OF MARYLAND and Andrichyn & Schnabel, Inc.**

No. 76–1380.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) Jan. 10, 1977.

Decided June 6, 1977.

Melvin Lashner, Adelman & Lavine, Philadelphia, Pa., for appellant.

Arthur Lefkoe, Wisler, Pearlstine, Talone, Craig & Garrity, Norristown, Pa., for appellees.

Submitted under Third Circuit Rule 12(6) Jan. 10, 1977.

Before GIBBONS and GARTH, Circuit Judges, and COHEN,* District Judge.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal by Westinghouse Electric Supply Co. (Westinghouse), the assignee of

---

* Mitchell H. Cohen, United States District Judge for the District of New Jersey, sitting by designation.

a subcontractor, questions the validity of two setoffs claimed by the general contractor and allowed by the district court in an action in which Westinghouse sought to collect the balance which the general contractor owed to the subcontractor.

The general contractor, Andrichyn & Schnabel, Inc. (Andrichyn), contracted with the Commonwealth of Pennsylvania to renovate portions of the Pennhurst State School and Hospital. Joseph Zangrilli & Sons (Zangrilli) subcontracted with Andrichyn to do the electrical work on this project. Zangrilli later assigned its rights under the subcontract to Westinghouse. Westinghouse then began this diversity action against Andrichyn and its bonding company, Fidelity and Deposit Company of Maryland, to collect the balance due to Zangrilli and thus to it as Zangrilli's assignee.

After a non-jury trial, the district court entered judgment in favor of Westinghouse in the amount of $16,928.24 plus interest. Westinghouse took this appeal to contest two setoffs in favor of Andrichyn which the district court permitted.[1]

## I.

The first contested setoff was in the amount of $26,360.31. It represents the net expense incurred by Andrichyn in purchasing certain automatic switches required by the Commonwealth. In order to explain the dispute between Zangrilli and Andrichyn concerning this item, it is first necessary to describe certain provisions in the contract between Andrichyn and the Commonwealth and in the subcontract between Andrichyn and Zangrilli.

Andrichyn's contract with the Commonwealth included detailed plans and specifications for the work to be performed on the Pennhurst project. However, that contract also permitted the Secretary of the Department of Property and Supplies to make "such alterations in the plans and specifications . . . as may be considered necessary or desirable, from time to time, to fully and perfectly complete the construction . . . ." That contract provided, in addition, that when changes ordered by the Commonwealth increased the contractor's expenses, "a fair and equitable sum shall be agreed upon, in writing, by negotiation between the contractor and the duly authorized representatives of the Bureau, before such work is begun." If the parties were unable to agree on a price, the contract permitted the Commonwealth to "direct the Contractor to do such extra work on a force account basis." The contract specified how the contractor's compensation for materials, labor, and equipment was to be calculated when the Commonwealth invoked the force account provision of the contract.

Unlike Andrichyn's contract with the Commonwealth, which was detailed and more than 200 pages long, Zangrilli's agreement with Andrichyn was a one-page form contract to which a few typewritten words and sentences were added. Under that contract, Zangrilli agreed "to furnish *all labor, material, and equipment to complete electrical work in its entirety* . . . required in the erection of *Emergency Renovations, Pennhurst State School & Hospital, Spring City, Pa.* . . . in accordance with *plans and specs* . . . ." (Italics added; italicized words and letters are those which were typed on the printed form contract.)

The original plans and specifications for the Pennhurst project called for the installation of certain manual switches. However, the Commonwealth later directed that automatic switches be installed. The district court made the following undisputed findings of fact with respect to the events which ensued:

5. . . .

---

1. The appellees, Andrichyn & Schnabel, Inc. and Fidelity and Deposit Co. of Maryland, cross-appealed (docketed as No. 76–1381) from the final order of the district court claiming additional setoffs by reason of delays allegedly caused by Zangrilli. The district court held that the asserted damages had not been proved to be the result of Zangrilli's actions. By a separate judgment order, we have on this date affirmed the district court in its disposition of this issue.

In order to negotiate the adjustment with the Commonwealth, Andrichyn requested Zangrilli to submit its additional charges for the change. The subcontractor wished to be relieved from purchasing the automatic switches. Eventually on January 27, 1971 by letter (Exhibit P–1), Zangrilli and Andrichyn agreed that Andrichyn would purchase the switches, and Zangrilli would install the same, for which Andrichyn would receive a credit from Zangrilli of $15,500.00. The parties stipulated at trial that this sum was later increased by agreement to $17,000.00. By reason of this agreement, Zangrilli did not have to purchase either the manual switches (as originally required), or the automatic switches required under the "change-order". The letter of January 27, 1971 (Exhibit P–1) further stated:

> The acceptance of this credit by this office [Andrichyn] is subject to the approval of the Department of Property and Supplies [Commonwealth of Pennsylvania].

6. Andrichyn and the Commonwealth failed to agree as to the proper adjustment for the change concerning the switches, and the Commonwealth directed the change-order on a "force account basis".

7. Zangrilli was advised by Andrichyn that the switch changes were to be on a "force account basis". By letter dated May 7, 1971, Zangrilli advised Andrichyn that it would not provide the automatic switches on a "force account", and would only proceed "under a fixed sum basis". (Exhibit D–9).

8. Pursuant to the agreement between Andrichyn and Zangrilli, Andrichyn purchased the automatic switches. The total cost to Andrichyn for the automatic switches was $40,455 (purchase price— $40,280 plus storage and unloading— $175). Eventually, under contract procedures for work done on a "force account", the Commonwealth allowed Andrichyn $14,094.69 additional for the change from manual to automatic switches. The difference between the amount allowed of $14,094.69 and the actual cost of purchase of $40,455 is $26,360.31. This sum Andrichyn claims as a credit chargeback to Zangrilli. Zangrilli concedes only $17,000 based on (a) the agreement (Exhibit P–1) as orally amended, and (b) Zangrilli's refusal to proceed on a "force account basis" (Exhibit D–9). This disputed difference is $9,360.31.

(Brackets in original.)

In the district court, Andrichyn argued that it should be allowed to set off the sum of $26,360.61 against the amount it owed to Zangrilli. Westinghouse, on the other hand, maintained that the force account provisions of the general contract were not binding on Zangrilli, and it therefore argued that a setoff of only $17,000 should be allowed, thereby arguing that the award of damages to Westinghouse should be increased by $9,360.31.

The district court agreed with Andrichyn. It wrote:

> The plans and specifications of the general contract would seem to encompass the contractual specifications as to procedures for adjusting change-orders. Consequently, the subcontractor could not unilaterally declare that it would not be bound by a "forced account" change-order direction from the Commonwealth.
>
> I have, therefore, concluded that Zangrilli would be liable to Andrichyn for the difference between that which Andrichyn paid for the automatic switches and that which the Commonwealth allowed, being the sum of $26,360.31. . . .

We have concluded that the district court did not err in permitting a setoff in the amount of $26,360.31.

### A.

 As we noted above, the district court permitted the $26,360.31 setoff because it believed that the subcontract between Zangrilli and Andrichyn incorporated the force account provisions contained in the general contract. In this appeal, both of the parties have also focused upon the terms of the original subcontract between Zangrilli and Andrichyn. We believe, how-

ever, that the rights and duties of Zangrilli and Andrichyn with respect to the switches are governed in the first instance, not by their original subcontract, but by the letter-agreement into which they entered on January 27, 1971. *See* pp. 1111–1112 *supra.* In our view, that agreement superseded the original subcontract insofar as the switches were concerned; it unconditionally shifted the duty to purchase the switches from Zangrilli to Andrichyn; and it obligated Andrichyn to accept $15,500 (later increased to $17,000) from Zangrilli as payment in full for purchasing the switches—provided that the Commonwealth agreed to increase its payments under the general contract by that amount.

The very terms of the January 27 agreement indicate that that agreement constituted immediate satisfaction and discharge of the parties' previous contractual duties with respect to the switches. Under Pennsylvania law and general contract law, a subsequent agreement has this effect only if that is the parties' intent. *Marine Towing Co. v. Fairbanks, Morse & Co.,* 225 F.Supp. 467, 473 (E.D.Pa.1963); *Advanced Management Research Inc. v. Emanuel,* 439 Pa. 385, 390–91, 266 A.2d 673, 675–76 (1970); *Hydro-Flex, Inc. v. Alter Bolt Co., Inc.,* 223 Pa.Super. 228, 234, 296 A.2d 874, 878 (Super.Ct.1972); Restatement (First) of Contracts §§ 418–19 (1932); 6 A. Corbin, Contracts § 1293 (1962).

In doubtful cases the following presumptions are utilized:

> Where a contract is made for the satisfaction of a pre-existing contractual duty, or duty to make compensation, the interpretation is assumed in case of doubt, if the pre-existing duty is an undisputed duty either to make compensation or to pay a liquidated sum of money, that only performance of the subsequent contract shall discharge the pre-existing duty; but if the pre-existing duty is of another kind, that the subsequent contract shall immediately discharge the pre-existing duty, and be substituted for it.

Restatement (First) of Contracts § 419 (1932). *See also Marine Towing Co. v. Fair-*

*banks, Morse & Co., supra,* at 473. In this case, since the pre-existing duty was Zangrilli's obligation to purchase the switches, it must be assumed that the execution of the subsequent agreement was intended to extinguish immediately the parties' pre-existing duties.

It also seems clear that whereas Andrichyn's promise to accept a credit of $15,500 (later increased to $17,000) as payment in full for purchasing the switches was subject to a condition precedent, Andrichyn's promise to assume the responsibility for purchasing the switches was not. The relevant portions of the January 27, 1971, agreement, which were typed on Andrichyn's stationery, read as follows:

> Confirming our telephone conversation January 26, 1972 [sic], you wish to be relieved of the purchasing of Automatic Transfer Switches.
>
> Our office will accept this responsibility and place a purchase order for the Automatic Transfer Switches with Westinghouse Electric Supply Company.
>
> . . . . .
>
> We accept your credit for the sum of fifteen thousand five hundred ($15,-500.00) dollars for the elimination of manual transfer switches and concrete pad. *The acceptance of this credit by this office is subject to the approval of the Department of Property and Supplies.* (Emphasis added.)

Thus, the only provision of the agreement which was conditioned upon the approval of the Commonwealth was Andrichyn's promise to accept a credit of $15,500. Andrichyn's promise to assume the responsibility for purchasing the switches was unconditional.

In sum, it appears that the agreement of January 27, 1971, required Andrichyn to purchase the switches, but it did not expressly fix the price which Zangrilli was obligated to pay for that service. If this contract were governed by Article 2 of the Uniform Commercial Code, the agreement might well be interpreted to require Zangrilli to pay a "reasonable price." Pa.Stat. Ann. tit. 12A, § 2–305(1) and (2) (1970).

However, since this contract is not governed by the UCC, the absence of a binding price term might make the agreement too vague to be enforced. *See Portnoy v. Brown,* 430 Pa. 401, 406, 243 A.2d 444, 447 (1968); *Thomas v. St. Joseph's Polish National Catholic Church,* 343 Pa. 328, 22 A.2d 661, 663 (1941); *McNeely v. Bookmyer,* 292 Pa. 12, 140 A. 542, 543 (1928). In this case, however, we need not consider whether the agreement of January 27, 1971, was enforceable, since Andrichyn has already purchased the switches:

> After goods have actually been delivered and accepted, or services actually rendered and received, the defendant is bound to make reasonable compensation therefor, whether the agreement under which the benefit was received was too indefinite for enforcement or not. It then becomes unnecessary to determine whether the defendant in reality promised to pay a reasonable price. If he did so promise, the court is enforcing his express promise. If he did not, the duty to pay is described as quasi contract; but it is identical in result.

1 A. Corbin, Contracts § 99 at 445 (1963) (Footnote omitted). *See also DeGasperi v. Valicenti,* 198 Pa.Super. 455, 457, 181 A.2d 862, 864 (1962); *Binns v. First National Bank of California, Pennsylvania,* 367 Pa. 359, 80 A.2d 768, 776 (1951); *Thomas v. R. J. Reynolds Tobacco Co.,* 350 Pa. 262, 38 A.2d 61, 63 (1944).

The remaining question, then, is whether the net expenses incurred by Andrichyn in purchasing and storing the switches constitute "reasonable compensation."

### B.

Under the original subcontract, Zangrilli was "to furnish all labor, material, and equipment to complete electrical work in its entirety . . . in accordance with the plans and specs. . . ." It seems clear that this provision required Zangrilli to comply with any changes ordered by the Commonwealth. Two well-established rules of contract interpretation support this construction. First, "[i]t is . . . hornbook law that what the parties do under a contract is highly important in determining the meaning of the agreement which they have made." *American Cyanamid Co. v. Ellis-Foster Co.,* 298 F.2d 244, 246 (3d Cir. 1962). *See also Fenestra, Inc. v. John McShain, Inc.,* 433 Pa. 137, 140, 248 A.2d 835, 837 (1969); *Maloney v. Glosser,* 427 Pa. 548, 552, 235 A.2d 607, 610 (1967); Restatement (First) of Contracts § 235(e) (1932); 3 A. Corbin, Contracts § 558 (1960). *Cf.* Pa. Stat.Ann. tit. 12A, § 1–205 (1970). In this case, neither Zangrilli nor Andrichyn appears to have questioned Zangrilli's contractual obligation to comply with the Commonwealth's change order.[2] Second, when the meaning of a contract is doubtful, "the interpretation which makes a rational and probable agreement must be preferred." *Unit Vending Corp. v. Lacas,* 410 Pa. 614, 617, 190 A.2d 298, 300 (1963). *See also Consolidated Tile and Slate Co. v. Fox,* 410 Pa. 336, 339, 189 A.2d 228, 230 (1963); *Wilkes-Barre Township School District v. Corgan,* 403 Pa. 383, 386–87, 170 A.2d 97, 98–99 (1961); 3 A. Corbin, Contracts § 552 at 210 (1960). In this case, Andrichyn's contract required it to honor the Commonwealth's change orders involving electrical work. Therefore, the most "rational" and "probable" interpretation of the phrase "plans and specs" in Andrichyn's agreement with its electrical subcontractor is that it meant the plans and specifications as modified by the Commonwealth's change orders. Any other interpretation would make it possible for the electrical subcontractor simply to refuse to comply with the Commonwealth's change orders. The general contractor would then be required to engage a second electrical subcontractor for the sole purpose of effecting the changes. Such an

---

2. For example, the January 27, 1971, agreement which Andrichyn drafted and which Zangrilli signed stated, "Confirming our telephone conversation January 26, 1972, [*sic*] you wish to be *relieved* of the purchasing of Automatic Transfer Switches." (Emphasis added.) Similarly, Westinghouse's brief states "Zangrilli wished to be *relieved* of buying the new switches." (Emphasis added.) Brief for Appellant at 4.

agreement would hardly be "rational" or "probable." [3]

Although the responsibility for purchasing the automatic switches was originally Zangrilli's, under the agreement of January 27, 1971, Andrichyn agreed to assume that responsibility. Andrichyn apparently did so because Zangrilli would have been unable to purchase the switches. The district court wrote:

> Although I made no specific finding of fact concerning the reason for Andrichyn agreeing to purchase the automatic switches, there was testimony to the effect that Zangrilli's credit rating and financial situation was such as to render it unable to make the purchase.

Since Andrichyn apparently undertook the responsibility of purchasing the switches in order to permit the work to go forward and to prevent Zangrilli from breaching the subcontract, "reasonable compensation" for Andrichyn should put it in the same financial position which it would have enjoyed if Zangrilli had performed its original obligation to purchase the switches. It is at this point that the interpretation of the original subcontract becomes relevant.

### C.

If the agreement of January 27, 1971, had never been executed and if Zangrilli had purchased the switches, it seems plain that the only compensation to which Zangrilli would have been entitled is that which the Commonwealth awarded on a force account basis.

As we have noted, the original contract obligated Zangrilli "to furnish all labor, material, and equipment to complete electrical work in its entirety . . . in accordance with plans and specs. . . ." We have already explained why we believe that the phrase "plans and specs" as used in this subcontract included modifications subsequently ordered by the Commonwealth. Given that interpretation, it seems clear that the phrase "plans and specs" must also include the force account provisions of the general contract. If the force account provisions were not incorporated, the subcontract would have obligated Zangrilli to purchase the automatic switches without specifying the amount of additional compensation it would receive. Absent clear evidence to the contrary, we cannot conclude that the parties intended such an unreasonable result. *See, e. g., Unit Vending Corp. v. Lacas, supra,* 190 A.2d at 300.

Westinghouse argues that the phrase "plans and specs" should not be interpreted to include the force account provisions. It points to the rule of construction which states that "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P. J. Carlin Construction Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916). It argues that the phrase "plans and specifications" means labor and materials but not the amount or method of compensation. *See Potts Manufacturing Co. v. Loffredo,* 235 Pa.Super. 294, 298, 340 A.2d 468, 471 (1975). Finally, it notes that the subcontract was drafted by Andrichyn, and it invokes the rule of construction that an ambiguous contractual provision should be construed against the draftsman. *Pittsburgh Steel Co. v. Patterson-Emerson-Comstock, Inc.,* 404 Pa. 53, 60, 171 A.2d 185, 189 (1961).

We are not persuaded by these arguments. We agree that a meticulous draftsman probably would not have used the phrase "plans and specifications" to refer to the amount of compensation which one of the contracting parties was to receive. But

---

**3.** Under that interpretation, the second electrical subcontractor might well be required to tear out work performed by Zangrilli. In addition, Andrichyn might be required to bear the cost both of equipment installed by Zangrilli and other equipment installed in its place by the second electrical subcontractor.

Similarly, if Zangrilli's subcontract did not cover change orders issued by the Commonwealth, Andrichyn would have been under no obligation to permit Zangrilli to perform such work even if the performance of that work would have been quite lucrative for Zangrilli.

we do not believe that we are required to give the colloquial phrase "plans and specs" in the one-page subcontract between Zangrilli and Andrichyn the same meaning which we would attach to the phrase "plans and specifications" in a detailed and meticulously drafted agreement. In light of all the circumstances in this case, we think that it is far more reasonable to interpret the phrase "plans and specs" to include the force account provisions of the general contract.[4]

The dissent advances an interpretation of the phrase "plans and specs" which differs both from ours and from the interpretation urged by Westinghouse. The dissent argues that that phrase refers solely to the "plans and specifications" which the Commonwealth was required to supply to the general contractor under part D–7 of the general contract. In the dissent's view, no other portions of the general contract were incorporated by reference into the subcontract. Dissenting Op. at pp. 1119–1120 *infra.*

▮ The dissent's construction, however, is even less plausible than the construction for which Westinghouse contends, for under the dissent's interpretation numerous provisions in the general contract which were obviously meant to bind the subcontractor would not be incorporated by reference into the subcontract. For example, parts F–10 and F–11 of the general contract provide:

[F] 10. SUBCONTRACTOR'S LIABILITY. The provisions of the contract as to performance by the Contractor shall apply to any subcontractor, his officers, agents and employees, in all respects as

if he and they were employees of the Contractor.

[F] 11. CONDUCT OF THE WORK. The work shall be conducted so as not to interfere with the work of other Contractors, nor to obstruct any thoroughfare or access to property, nor to impede highway traffic, nor to interfere with the functions of any Institution, except as may be authorized by the Bureau. Fire hydrants adjacent to the project shall be kept accessible at all times and no materials or obstructions shall be placed within twenty (20) feet of any such hydrants. Footways and sewer inlets shall not be obstructed.

Those provisions of the general contract would be of little efficacy if they did not bind the subcontractor as well as the general contractor. Similarly, the provisions of the general contract concerning sanitary facilities on the job site, cleaning up the job site, parking, traffic, and safety requirements also appear highly relevant to the subcontractor's performance. Nevertheless, none of these provisions is referred to or contained in part D–7 of the general contract. Thus, under the dissent's interpretation, none of these provisions would bind the subcontractor. Instead, in the dissent's view, the subcontractor's only obligation was to perform work which complied with the documents labelled "plans and specifications"; with respect to all other matters, the subcontractor was permitted to do as it pleased! We are unwilling to give the original subcontract this unrealistic interpretation based solely upon the dissent's definition of "plans and specification"[4a] and its

---

4. Even if the force account provisions had not been incorporated into the subcontract, Zangrilli's compensation for purchasing the automatic switches would still have been limited to the amount awarded by the Commonwealth on a force account basis. If a provision entitling Zangrilli to "Reasonable compensation" were read into the contract [*cf.* Pa.Stat.Ann. tit. 12A, § 2–305(1) and (2) (1970)] or if Zangrilli purchased the switches and thus became entitled to "reasonable compensation" on a quasi-contractual basis, [*see DeGasperi v. Valicenti, supra; Binns v. First Nat'l Bank of Calif., Pa., supra*], we believe that the "reasonable com-

pensation" to which Zangrilli would be entitled would equal the amount awarded by the Commonwealth under the force account provisions.

4a. The dissent, by joining the majority in approving the $9,170.37 credit, appears to have receded from its interpretation of the phrase "plans and specs." The $9,170.37 credit represents the costs incurred by Andrichyn as a result of the malfunction of a 2000 kv transformer installed by Zangrilli. (*See* Part II of this opinion.) The district court concluded that Zangrilli was liable for these costs based pri-

reading of *Potts Manufacturing Co. v. Loffredo, supra,* which does no more than to construe a particular subcontract with reference to the intent of the parties to that agreement.

In conclusion, we are convinced that if Zangrilli had purchased the automatic switches, the only compensation to which it would have been entitled under the original agreement was that awarded by the Commonwealth on a force account basis. If Zangrilli had been unable to purchase the switches for the amount awarded by the Commonwealth, Zangrilli, not Andrichyn, would have been required to bear the extra expense. Under the present circumstances, a similar result must obtain. "Reasonable compensation" for Andrichyn must equal the reasonable net expense which it incurred in purchasing and storing the switches. The district court found that that amount equals $26,360.31. In the absence of any challenge on appeal to the reasonableness of the amounts paid by Andrichyn to purchase and store the switches, we are satisfied that those amounts are reasonable.

## II.

The second contested setoff was in the amount of $9,170.37. It represents the costs incurred by Andrichyn as a result of the malfunction of a 2000 kilovolt transformer installed by Zangrilli.

The district court found the following facts, none of which is in dispute:

16. After the installation of the 2000 KV transformer by Zangrilli, and after Zangrilli had left the jobsite, the 2000 KV transformer malfunctioned. *The cause of the malfunction was not established.* The supplier repaired the transformer without charge, but Andrichyn incurred substantial costs in removing the transformer, renting a temporary replacement transformer and similar costs. Andrichyn, being unable to obtain Zangrilli, employed Carr and Duff to remove, ship, replace with temporary service, and re-install the 2000 KV transformer. Andrichyn incurred expenses of $9,170.37 for the services of Carr and Duff and the rental of the replacement equipment.

(Emphasis added.)

The district court also reached the following conclusions of law:

2. . . .

(b) Electrical equipment and work supplied by Zangrilli under the subcontract would be guaranteed for one year from date of acceptance, and in the event of a breakdown, *caused by defective equipment, installation or workmanship,* such would be repaired or replaced without additional charge to the general contractor.

. . . . .

(Emphasis added.)

6. Under the guarantee of materials and workmanship, Zangrilli is liable to Andrichyn for the direct costs of replacing the burned out 2000 KV transformer of $9,170.37, which includes rental of substitute equipment during repairs, Carr and Duff additional engineering and installation services, and miscellaneous direct expenses.

---

marily upon parts F–10 and F–17 of the general contract. *See* Memo Op. at 14. F–17 provides:

17. CONTRACTOR'S GUARANTEE. The Contractor shall guarantee his work and shall remedy, without cost to the Commonwealth, any defects which may develop therein during a period of one (1) year from the date of completion and acceptance, as provided in the Agreement.

F–10, which is quoted in full in the text, makes "provisions of the contract as to performance by the contractor" applicable to the subcontractors as well. The district court concluded that F–10 was binding upon the subcontractor because it was part of the "plans and specs" incorporated into the subcontract by reference. Memo Op. at 14. Westinghouse did not contest this interpretation (Brief for Appellant at 10), and we have taken a similar position. *See* pp. 1117–1118 *infra.* However, under the interpretation of the phrase "plans and specs" advanced by the dissent, F–10—like E–4 (force account work)—clearly would not bind the subcontractor. Thus, while the dissent may have a different, unarticulated reason for joining the majority in approving the $9,170.37 credit, its position on the surface appears to be contradictory.

Westinghouse agrees with the conclusion of law 2(b) set out above. However, it maintains that the district court erred in allowing Andrichyn to set off its expenses without proving that the breakdown was "caused by defective equipment, installation or workmanship." Westinghouse specifically points to the district court's finding that "[t]he cause of the malfunction was not established."

We believe that Westinghouse has misinterpreted the meaning of the district court's finding that "[t]he cause of the malfunction was not established." Westinghouse interprets this statement to leave open the possibility that "Andrichyn's negligence or intentional conduct could have caused the malfunction." Brief for Appellant at 11. We are convinced, however, that that was not what the district court meant to say. When all of the court's findings and its memorandum opinion are read together, we are persuaded that, while the court may not have been satisfied that the precise cause of the malfunction had been established, the court was convinced that it was caused by "defective equipment, installation or workmanship." For example, the court wrote, "It is entirely possible that the plaintiff [Westinghouse] may have a cause of action over against the supplier of the 2000 KV transformer, if the fault was in the transformer and not its installation." App. at 46a. This statement clearly suggests that, while the court ruled out the possibility that "Andrichyn's negligence or intentional conduct" were responsible, it had not determined whether the malfunction had been caused by a defect in the transformer itself or whether improper installation by Zangrilli was at fault. Since the court contemplated the possibility of a subsequent action by Westinghouse against the manufacturer of the transformer, the court may have gone out of its way to state that the cause of the malfunction was not established in order to make certain that the doctrine of issue preclusion did not prevent Westinghouse from maintaining that suit. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Restatement (Second) of Judgments § 88 (Tent.Draft No. 3, 1976).

In sum, we are convinced that the district court did find that the malfunction was "caused by defective equipment, installation or workmanship" and that therefore Zangrilli was obligated to bear the reasonable costs occasioned by that breakdown. As a result, we have concluded that the district court did not err in permitting Andrichyn to set off the costs in the amount of $9,170.37 which the malfunction caused.

### III.

Having concluded that the district court did not err in permitting Andrichyn to set off the cost of automatic switches and the transformer charges against the amount claimed by Westinghouse, we will affirm the order of the district court dated January 19, 1976, which entered judgment in favor of Westinghouse for $16,929.24 plus interest from June 4, 1974.[5] Costs on this appeal are to be taxed against Westinghouse.

GIBBONS, Circuit Judge, dissenting:

In this appeal two separate setoffs against amounts claimed by an electrical subcontractor against a general contractor are in issue. One of those credits, amounting to $9,170.37, arises out of a dispute over a defective transformer. I join in the majority's judgment insofar as it affirms the award of this credit to the general contractor. In regard, however, to the majority's disposition of the other setoff, resulting in an award to the general contractor of a net credit of $9,360.31, I respectfully dissent. The $9,360.31 represents the difference between the net expense ($26,360.31) incurred by the general contractor in purchasing certain electrical switches required by the Commonwealth and the portion of that expense which the subcontractor allegedly agreed to absorb ($17,000.00). To resolve

---

**5.** The judgment provides that it shall be entered against the defendant Fidelity and Deposit Co. of Maryland, which, as previously noted, was Andrichyn's bonding company.

the question over who should absorb the disputed $9,360.31 in expenses it is necessary to interpret the provisions of the subcontract. Despite the studied obfuscation of the majority opinion, it is a rather simple matter of the plain meaning of the chosen language. The district court and the majority chose, however, to rewrite the subcontract in order to substitute what they think may be a fair result for the bargain struck by the parties.

The general contractor, Andrichyn, urges that the "Force Account Work" provisions in Part E of the contract between it and the Commonwealth of Pennsylvania are incorporated by reference in the subcontract between it and Zangrilli, the electrical subcontractor. If there is any such incorporation by reference, it is by virtue of the following language in the subcontract:

> Witnesseth that the said party of the first part [Zangrilli] . . . hereby covenants, promises and agrees to furnish all labor, material, and equipment to complete electrical work in its entirety . . required in the erection of Emergency Renovations, Pennhurst State School & Hospital, Spring City, Pa. P.W.–7291–1–4–2–3 in accordance with plans and specs and addendum # 1 prepared by Pa. Dept. of Property & Supplies and attached agreement on page 2.

No one contends that "addendum # 1 prepared by Pa. Dept. of Property & Supplies and attached agreement on page 2" is a cross-reference to the "Force Account Work" provisions in Part E of the general contract. If there is a cross-reference it is in the words "plans and specs." The heart of the majority's reasoning is:

1. "TABLE OF CONTENTS

\* \* \* \* \* \*

GENERAL CONDITIONS

A. DEFINITIONS ........................ 22

B. BONDS ............................. 23

C. INSURANCE ........................ 23

 1. Certificate of Insurance 23
 2. Special Hazards 23
 3. Workmen's Compensation 24
 4. Renewal of Policies 24

D. PLANS AND SPECIFICATIONS ......... 24

 1. Approved Plans 24
 2. Interpretation of Plans Versus Specifications 24

We have already explained why we believe that the phrase "plans and specs" as used in this subcontract included modifications subsequently ordered by the Commonwealth. Given that interpretation, it seems clear that the phrase "plans and specs" must also include the force account provisions of the general contract. . .

. . . . .

. . . We agree that a meticulous draftsman probably would not have used the phrase "plans and specifications" to refer to the amount of compensation which one of the contracting parties was to receive. But we do not believe that we are required to give the colloquial phrase "plans and specs" in the one-page subcontract between Zangrilli and Andrichyn the same meaning which we would attach to the phrase "plans and specifications" in a detailed and meticulously drafted agreement. . . .

At p. 1115 *supra.*

And so, the majority meticulously redrafted the agreement for the benefit of Andrichyn, its original draftsman. That is not the way the law of contracts appears to me. Moreover, it is inconsistent with the plain meaning of the language, because "plans and specs" refers not to the section of the general contract containing the Force Account provisions, but to an entirely different set of documents.

A portion of the table of contents of the general contract is printed in the margin.[1]

 3. Interpretation of Plans 24
 4. Discrepancies 24
 5. Incidental Work 24
 6. Supplementary Drawings 24
 7. Plans and Specifications Furnished the Contractor 25

E. CONTRACT CHANGES ................. 25

 1. Right to Make Changes 25
 2. Conditions Governing Changes 25
 3. Contractor's Compensation for Changes 25
 4. Force Account Work 25

F. CONTRACTOR'S DUTIES AND RESPONSIBILITIES ................... 26

. . ."

**1120**

Under Part D appears item 7, "Plans and Specifications Furnished the Contractor." Item 7 refers to a list of separate documents detailing the plans and specifications of the entire project, and provides that the Commonwealth will supply the general contractor with a stated number of copies of such "plans and specifications." Under Part E appears item 4, "Force Account Work." Item 4 details the formula by which the Commonwealth is to pay the general contractor for project changes involving additional work. There is no reference in item 4 to the method by which the general contractor is to pass the costs of such changes on to its subcontractors. The only possible meaning of "plans and specs" as used in the subcontract is to the separate set of documents referred to in Part D, item 7. To expand the scope of this phrase to include the force account work provisions in Part E of the general contract, provisions which make absolutely no reference to plans and specifications or to subcontractors, is to flout the established law governing the interpretation of subcontracts.

The settled rule as to the interpretation of subcontracts which refer to general contracts is as follows:

> The reference in the sub-contract to the drawings and specifications was evidently for the mere purpose of indicating what work was to be done, and in what manner done, by the sub-contractor. Notwithstanding occasional expressions of a different view (see *Shaw v. First Baptist Church*, 44 Minnesota, 22, 24 [46 N.W. 146]; *Avery v. Supervisors*, 71 Michigan, 538, 546, 547 [39 N.W. 742]; *Stein v. McCarthy*, 120 Wisconsin, 288, 295 [97 N.W. 912]), in our opinion the true rule, based upon sound reason and supported by the greater weight of authority, is that in the case of sub-contracts, as in other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified. *Woodruff v. Hough*, 91 U.S. 596, 602 [23 L.Ed. 332, 335]; *Neuval v. Cowell*, 36 California, 648, 650; *Mannix v.*

*Tryon*, 152 California, 31, 39 [91 P. 983]; *Moreing v. Weber*, 3 Cal.App. 14, 20 [84 P. 220]; *Short v. Van Dyke*, 50 Minnesota, 286, 289 [52 N.W. 643]; *Noyes v. Butler Bros.*, 98 Minnesota, 448, 450 [108 N.W. 839]; *Modern Steel Co. v. English Construction Co.*, 129 Wisconsin, 31, 40, 41 [108 N.W. 70].

*Guerini Stone v. P. J. Carlin Construction Co.*, 240 U.S. 264, 277–78, 36 S.Ct. 300, 306, 60 L.Ed. 636 (1916); accord, *Lodges 743 and 1746, etc. v. United Aircraft*, 534 F.2d 422, 441 (2d Cir. 1975); *R. P. Farnsworth & Co., v. Tri-State Construction Co.*, 271 F.2d 728, 736 (5th Cir. 1959). The law of Pennsylvania is not to the contrary. In *Potts Manufacturing Co. v. Loffredo*, 235 Pa.Super. 294, 340 A.2d 468 (1975), the Pennsylvania court held that, as a matter of law, a subcontract's reference to the plans and specifications of the general contract did not incorporate any of the general contract's other provisions, including those provisions relating to the acceptance and payment for work performed pursuant to the plans and specifications of the general contract. As is evident, the majority opinion is devoid of any reference to Pennsylvania precedents for its rewriting of the subcontract to include a cross-reference to a section of the general contract which the subcontract does not even mention.

What the district court did, and what the majority has done, is substitute, for the subcontract the parties draw, their own notions about how a prudent general contractor ought to have proceeded. In doing so, however, they are proceeding not out of knowledge, but out of ignorance of the practices and market conditions in the construction industry at the time the job was bid. It is at least as likely that in those market conditions a general contractor would be willing to contract with the Commonwealth on a cost adjustable basis (because that was required by the Commonwealth), while negotiating with his subcontractors for the best fixed price arrangement he could bargain for. The instant subcontract was for a fixed price. I do not suggest that I know what the market condi-

tions were, since there is nothing in the record about them. Moreover, it is at least questionable whether parol evidence about market conditions would be admissible to vary the plain terms of the subcontract. *See, e. g., Potts Manufacturing Co., supra.* My point is that what the majority has done is far worse than a parol evidence violation. It is the reliance upon a completely uninformed hunch, respecting market conditions and industry practices, as a basis for rewriting the subcontract.

Moreover, the general contractor's actions respecting the purchase of the automatic transfer switch is entirely inconsistent with the notion that the force account formula was a part of the subcontract. If it was, there was no need to negotiate a new and separate agreement. That agreement is quoted in the margin.[2] There is extended discussion of it in the majority opinion, but the opinion concludes, correctly, that it did not dispose of the question of price adjustment. Rather, when one sifts through the verbiage, the majority concludes that it was surplusage, since the "Force Account Work" clause of the general contract applied. Obviously, however, Andrichyn did not think so at the time it was negotiated.

Finally, the most outrageous portion of the majority opinion is in footnote 4:

Even if the force account provisions had not been incorporated into the subcontract, Zangrilli's compensation for purchasing the automatic switches would still have been limited to the amount awarded by the Commonwealth on a force account basis. If a provision enti-

tling Zangrilli to "Reasonable compensation" were read into the contract [*cf.* Pa.Stat.Ann. tit. 12A § 2–305(1) and (2) (1970)] or if Zangrilli purchased the switches and thus became entitled to "reasonable compensation" on a quasi-contractual basis, [*see DeGasperi v. Valicenti, supra; Binns v. First Nat'l Bank of Calif., Pa., supra*], we believe that the "reasonable compensation" to which Zangrilli would be entitled would equal the amount awarded by the Commonwealth under the force account provisions.

The very fact that the majority makes this point shows more clearly than anything else its lack of confidence in its contract analysis. But what is worse, is that since the district court made the same misinterpretation of the subcontract as the majority, it had no occasion to pass on the question of what is "reasonable compensation" for the general contractor's purchase of the automatic switches. Appellant seeks only review of the district court's legal error, and neither appellant nor appellee has had occasion to address the question of the reasonableness of the setoff. Without reference to testimony in the record, however, the majority in an attempt to bolster a deficient legal analysis, now makes a finding of fact which the district court never made, and on which the parties have had no opportunity to be heard. Such highhandedness is less than due process in an appellate tribunal.

I would remand for redetermination of the setoff on the assumption that the "Force Account Work" clause of the general contract was not referenced in and was not a part of the subcontract.

---

2. Mr. Anthony Zangrilli
 Jos. Zangrilli & Sons, Inc.
 53 High Street
 Pottstown, Penna. 19464
 Re: Pennhurst State School and Hospital—PW 7291 # 1–4–2–3
 Automatic Transfer Switches
 Dear Tony,
 Confirming our telephone conversation January 26, 1972, you wish to be relieved of the purchasing of Automatic Transfer Switches. Our office will accept this responsibility and place a purchase order for the Automatic Transfer Switches with Westinghouse Electric Supply Company.

It will be your company's responsibility to receive, unload, set in place and do all required wiring to energize the switches, all excavation will be done under your original contract, leaving this site properly graded, then seeded. We accept your credit for the sum of fifteen thousand five hundred ($15,500.00) dollars for the elimination of manual transfer switches and concrete pad.
 The acceptance of this credit by this office is subject to the approval of the Department of Property and Supplies.
 If you are in accord, kindly sign copy of this letter and return for our files.